D E C I S I O N. {¶ 1} Defendant-appellant William B. Ushry III appeals from the judgment of the Hamilton County Court of Common Pleas convicting him of murder and aggravated burglary. Ushry raises three assignments of error for our review in which he contends (1) that the evidence at trial supported a finding of not guilty by reason of insanity; (2) that he was denied the effective assistance of counsel; and (3) that misconduct by the assistant prosecutor denied him a fair trial. Because we find none of the assignments meritorious, we affirm the judgment of the trial court.
 I. Factual and Procedural Posture {¶ 2} Ushry was a good friend of Antonio Hill and often visited Hill and his girlfriend, Alexis Norris, at their apartment on Winneste Avenue. On April 25, 2004, Ushry came over to their apartment in the early afternoon and stayed for approximately thirty minutes. Later that afternoon, as Antonio and Alexis were getting ready to leave for dinner at his aunt's home, Ushry returned with a jewelry box. He told Antonio and Alexis that he needed to pawn the jewelry for rent money. Antonio looked at the jewelry with Ushry for approximately ten minutes. Ushry then left with the jewelry box.
 {¶ 3} Sometime between 4 and 5 p.m., Iris Stevenson picked up her cousin Antonio, Alexis, and her sister Natalie to take them to dinner at her mother's house. Natalie lived in the same apartment complex as Antonio and Alexis. After dinner, Iris and her sister Christina drove Natalie, Antonio, and Alexis home. It was dark outside when Iris dropped everyone off in the parking lot behind their apartments. Iris and Christina waited in the van while everyone went to their apartments.
 {¶ 4} As Antonio and Alexis were walking to their apartment, they noticed that the kitchen light had been turned on and that a window by the back door had been broken. But before they could enter the apartment, Ushry came running out the back door and started asking Antonio where his ring was located. Antonio, sensing that Ushry wanted to fight, ran to Natalie's apartment to avoid a confrontation. Iris watched from the van as Ushry chased Antonio. When Antonio had made it safely inside Natalie's apartment, he called for emergency assistance.
 {¶ 5} In the meantime, Ushry had run back to where Alexis was standing. Alexis shrugged her shoulders and pulled on her clothes, indicating that she did not have anything. Ushry then stabbed her in the neck with a knife. Iris and Antonio watched as Ushry stabbed Alexis several more times. Iris started blowing the horn and screaming, while Christina dialed the number for emergency assistance.
 {¶ 6} Ushry then ran back towards Natalie's apartment. Alexis walked to the front of the van and fell to the ground. When Ushry could not get inside Natalie's apartment, he ran back to Alexis, stood over her, and began stabbing her again. Iris started blowing the horn. Ushry looked up at her, flinched, and moved towards her. When Iris threw her hands up in the air, Ushry returned to stabbing Alexis. He then ran inside the back door of Alexis and Antonio's apartment and disappeared.
 {¶ 7} After Ushry had left, Alexis managed to get up off the ground. She staggered toward the van. When she had made it to the van, she told Iris that she had been stabbed. Once Alexis was inside the van, Iris drove to the front of the apartment building. She honked the horn and yelled for Natalie and Antonio. After they got into the van, Iris started driving towards the nearest hospital. As she turned onto Winton Road, Iris saw police cars, a fire truck, and an ambulance. She stopped the van and signaled to them for help. The paramedics tried to help Alexis, who was lying on the back seat of the van, but her stab wounds were too extensive. She died at the scene. When the police officers questioned Antonio, Natalie, Christina, and Iris about the stabbing, Antonio identified Ushry as the assailant.
 {¶ 8} In the meantime, several police officers had responded to the apartment complex where Alexis had been stabbed. They found several drops of blood on the pavement, as well as Alexis's hooded sweatshirt, her purse, and her keys. Alexis's sweatshirt had a large hole and blood stains on it. Ushry's fingerprints were found on a broken window near the back door of Antonio and Alexis's apartment. Photographs taken of the inside of their apartment showed that it had been completely ransacked. Drawers had been pulled out of dressers, clothes had been thrown around, and beds had been overturned.
 {¶ 9} Around the same time, Ushry's father had contacted the police. He told them that Ushry had hurt someone and asked that they respond to his home. When the police arrived, he gave them a knife that Ushry had been carrying. Ushry was arrested, read his Miranda rights, and transported to police headquarters.
 {¶ 10} After answering some preliminary questions and signing a written waiver of his Miranda rights, Ushry was questioned by two police detectives for approximately 25 minutes about Alexis's murder. Ushry spoke with them for ten to twelve minutes before agreeing to have his statement tape-recorded. Ushry told police that he had gone to Antonio and Alexis's apartment earlier that afternoon to get his hair braided. While he was there, Ushry had told Antonio and Alexis that his apartment had been broken into, that his rent money had been stolen, and that he needed money to pay his rent. They had then become so involved in talking about his rent money that Alexis did not end up braiding his hair.
 {¶ 11} After their conversation, Ushry left and went to his parents' home. He returned to Antonio and Alexis's apartment later that afternoon with a jewelry box that he had stolen from his mother. He was hoping to pawn some of the jewelry for rent money. He and Antonio had looked at the jewelry while they smoked some marijuana. Antonio was interested in one particular ring, but he decided not to buy it. He and Antonio then put the jewelry back in the box, and they all three left the apartment.
 {¶ 12} Ushry told police that when he got back to his apartment, he noticed that the ring Antonio had been looking at was missing. He became upset because the only place he had removed the jewelry from the box was at Antonio and Alexis's apartment. So he concluded that they must have stolen the ring from him. He decided to go back to their apartment to confront them. If they returned the ring to him, everything would have been forgiven, but if they did not return the ring, he was going to take back the ring any way that he possibly could. When he got to their apartment, no one was there, so he waited outside for a while, but he eventually left.
 {¶ 13} At approximately 9:20 p.m., he came back to the apartment and discovered that they had still not returned, so he broke a window near the back door and climbed inside to look for the ring. When he could not find the ring, Ushry told police, he started taking things in the apartment to compensate him for the value of the stolen ring. When Antonio and Alexis returned, he ran out of the apartment and confronted them about the ring. They denied having the ring. He started chasing them, and when he caught up with Alexis, he did what he had to do.
 {¶ 14} Ushry's taped interview proceeded just as the oral one, until he was questioned directly about the stabbing. At that point, Ushry started talking about cameras in his apartment and people touching his genitalia. Shortly thereafter, the police concluded the interview. Ushry was photographed, and his clothes were collected for testing. Laboratory analysis showed that the blood on the knife, the blood on the hooded sweatshirt, and the blood on Ushry's clothing belonged to Alexis.
 {¶ 15} When the police examined Ushry's car, they found dried blood stains on the steering wheel, on the driver's side door and seat belt, and on an envelope in the front seat. They also found several items that belonged to Antonio and Alexis in the car, including DVDs, a DVD player, a Play Station, Play Station games, a television, and a stereo.
 {¶ 16} An autopsy revealed that Alexis had been stabbed eleven times. She had two wounds on her neck, one of which had cut her jugular vein; three wounds to the chest, with two of the wounds going through her lung and one of the wounds going through her heart; three wounds on her upper back; and three wounds on her upper arm. A deputy coroner concluded that Alexis had died from injuries to her heart and lungs caused by the stab wounds.
 {¶ 17} Ushry was subsequently indicted for two counts of aggravated murder in violation of R.C. 2903.01(A) and 2903.01(B) (counts one and two), one count of murder in violation of R.C. 2903.02(B) (count three), and two counts of aggravated burglary in violation of R.C. 2911.11(A)(1) and 2911.11(A)(2) (counts four and five). He entered a plea of not guilty by reason of insanity and asked the trial court to evaluate his competency to stand trial. On June 30, 2004, the trial court found Ushry incompetent to stand trial and sent him to the Twin Valley Behavioral Healthcare Facility for treatment.
 {¶ 18} After five months of treatment, Ushry was found competent to stand trial. He was then transported back to the Hamilton County Justice Center, where Dr. Carla Dryer, a clinical psychologist, Dr. James Hawkins, a general and forensic psychiatrist, and Dr. Melvin Nizny, also a general and forensic psychiatrist, examined him to determine his sanity at the time of the offenses. While all three experts agreed that Ushry was suffering from paranoid schizophrenia at the time of the offenses, Drs. Dreyer and Hawkins concluded that Ushry's mental illness had not prevented him from understanding the wrongfulness of his acts.
 {¶ 19} On August 8, 2005, Ushry waived his right to a jury, and his case proceeded to trial before the court. The trial court found Ushry guilty of the lesser-included offense of murder in count one and of aggravated burglary as charged in count five. The trial court acquitted him of the remaining offenses. The trial court sentenced Ushry to 15 years to life for the murder and to three years for the aggravated burglary, and it ordered the sentences to be served concurrently.
 II. Not Guilty by Reason of Insanity {¶ 20} In his first assignment of error, Ushry contends that he proved by a preponderance of the evidence that he was not guilty by reason of insanity, and that the trial court's rejection of his defense was against the manifest weight of the evidence.
 {¶ 21} "To succeed on his insanity defense, [Ushry] had to prove by a preponderance of the evidence that, as a result of a several mental disease or defect, he did not know the wrongfulness of his acts. [Citations omitted.] The Ohio Supreme Court has stated that 'the weight to be given the evidence and the credibility of the witnesses concerning the establishment of the defense of insanity in a criminal proceeding are primarily for the trier of fact.' [Citations omitted.] Thus, if the record demonstrates that the trial court, as the trier of fact, considered the insanity defense, the reviewing court should defer to the trial court's interpretation of the evidence. [Citations omitted.] Moreover, a reviewing court should only reverse a trial court's judgment on the defense of insanity where the trial court was presented with overwhelming and uncontradicted evidence of the defendant's insanity, and where that evidence was arbitrarily ignored."[1]
 {¶ 22} At trial, Ushry presented testimony from his parents and Dr. Nizny. Ushry's parents testified that he had been acting strangely and experiencing psychiatric difficulties in the months preceding the offenses. They testified that Ushry came to stay with them several days prior to the offenses because he was seeing shadows and hearing voices in his apartment. On the day of the offenses, Ushry was quite agitated and paranoid. He told his parents that someone had stolen his rent money and asked if they would give him money for his rent. When they told him they had no money to give him, he became more agitated. When Ushry's father went upstairs to check on him, Ushry was staring at the television, which was turned off, and was talking to it. Shortly thereafter, Ushry left the house.
 {¶ 23} After Ushry had left, his parents discovered that he had taken a jewelry box and a knife from their bedroom. When Ushry returned to their home later that night, he seemed to be in another world. He was very agitated. He was holding the knife in his hand. He told them that he might have hurt someone. Ushry's father called the police. Ushry then began talking about people watching him and touching his genitalia. By the time the police arrived, Ushry was almost comatose.
 {¶ 24} Dr. Nizny testified that he examined Ushry for eight and a half hours on March 7, April 3, and May 2, 2005. Dr. Nizny testified that Ushry had been psychiatrically hospitalized for paranoid schizophrenia in April 2003, and that he had been participating in a random drug study at University Hospital, but that he had not been consistent in taking his medication. Dr. Nizny testified that Ushry had also been abusing drugs and alcohol at the time of the offenses.
 {¶ 25} Dr. Nizny testified that Ushry had a history of delusions and hallucinations, which included Ushry's belief that others were sexually involved with him and that he was to do or not to do things based on the voices that he was hearing. Ushry told Dr. Nizny that he had been hearing four voices, three of which were famous female singers, and that these voices would command him to do things. Ushry told Dr. Nizny that these voices had told him to go to Antonio and Alexis's apartment, to break in, and to kill Alexis. Dr. Nizny testified that collateral contact with Ushry's parents confirmed that Ushry had been experiencing delusions and hallucinations immediately before and after the offenses.
 {¶ 26} Dr. Nizny testified that Ushry had been operating under the delusional belief that someone had broken into his apartment and stolen his rent money, and that he was responding to command hallucinations when he broke into Antonio and Alexis's apartment, took their property, and stabbed Alexis. Dr. Nizny believed that Ushry's statements to his parents and his statements to the police immediately after the offenses, as well as his statements to the mental-health staff at the Hamilton County Justice Center, supported his conclusion that Ushry was actively psychotic during the offenses and was, therefore, unable to understand the wrongfulness of his actions.
 {¶ 27} To rebut the testimony of Ushry's parents and Dr. Nizny, the state called Drs. Dreyer and Hawkins. Dr. Dreyer testified that she examined Ushry in June 2004 and found him incompetent to stand trial. Dr. Dreyer testified that, during the competency examination, Ushry was given a Structure Interview Reported Symptoms Test or "SIRS" test, and that five out of the eight primary scales indicated that Ushry was malingering.
 {¶ 28} Dr. Dreyer testified that she examined Ushry in December 2004 for purposes of determining his mental state at the time of the offenses. Ushry told Dr. Dreyer that prior to the offenses he was experiencing a great deal of paranoia and hallucinations. Ushry stated that he had lost his rent money, that he had stolen some jewelry from his parents' home, and that he had then taken the jewelry to Antonio's apartment, where Antonio had looked at the jewelry with him. When he got back to his apartment, Ushry looked through the jewelry, but could not find the ring that Antonio had looked at, so he "got mad." Ushry told Dr. Dreyer that he believed his radio was giving him subliminal messages. Shortly thereafter, he went to Antonio's apartment to get the ring back.
 {¶ 29} Ushry told Dr. Dreyer that he waited outside Antonio and Alexis's apartment for half an hour, before breaking a window and going inside. Once he was inside the apartment, Ushry told her, he started taking items and putting them in his car. When Antonio and Alexis returned home, he ran outside and confronted them about the ring. Antonio told Ushry that he did not know where the ring was located. Ushry stated that Antonio then began to run away from him because he was holding a knife in his hand. When Ushry could not catch Antonio, he ran back to where Alexis was standing. He asked her where the ring was located, but she began to run away from him as well.
 {¶ 30} Ushry recalled grabbing Alexis's clothing, ripping it, and then stabbing Alexis in the neck, back, and chest. Ushry stated that when Alexis fell to the ground, Antonio was yelling, "You got it coming," so Ushry started chasing after Antonio again. Ushry told Dr. Dreyer that he lost his temper and went back to Alexis and started stabbing her again. Ushry stated that he had intended to harm Alexis and that he understood that this was wrong, but that he felt that he needed to do it due to his level of anger.
 {¶ 31} Ushry told Dr. Dreyer that he had left the scene and went to his parents' home because Alexis's relatives lived in the neighborhood and he was concerned that they might retaliate against him. Ushry stated that he was able to cool down when he was driving to his parents' home. As he did so, he began to feel bad about what he had done. When he arrived home, he told his parents that he had hurt someone.
 {¶ 32} Dr. Dreyer testified that Ushry's behavior on the night of offenses was consistent with his stated motive, which was to retaliate against Antonio and Alexis, and that his behavior was the result of poor impulse control brought on by his mental illness. She acknowledged that Ushry had been experiencing active symptoms of psychosis preceding, during, and after the time of the alleged offenses. She also acknowledged that Ushry's marijuana use on the day of the offenses had probably made his mental illness more active and florid.
 {¶ 33} In her opinion, however, Ushry's actions and statements immediately following the incident demonstrated that he understood the wrongfulness of his actions. Dr. Dreyer admitted that Ushry had reported experiencing delusions and hallucinations before and after the offenses, but testified that he had never mentioned experiencing the command hallucinations that he had reported to Dr. Hawkins and Dr. Nizny. Thus, Dr. Dreyer concluded that while Ushry's mental illness had impaired his judgment on the day of the offenses, he had still been able to comprehend the wrongfulness of his actions. Thus, she concluded that Ushry did not meet the strict criteria for an insanity defense.
 {¶ 34} Dr. Hawkins testified that he had interviewed Ushry in February 2005 for an hour and a half. Ushry told Dr. Hawkins that he had taken some jewelry from his mother because he could not find his money order and that he was planning to pawn the jewelry for rent money. Ushry also told Dr. Hawkins that he remembered being outside Antonio and Alexis's apartment when the voices told him to go in. Ushry then stated that he got lightheaded. The next thing he remembered was being in the interrogation room and talking on the tape recorder.
 {¶ 35} Dr. Hawkins testified that Ushry's reports of experiencing command hallucinations at the time of the offenses had not been documented in his medical records or in previous examinations, and that Ushry's description of these command hallucinations was atypical. Dr. Hawkins further testified that the fact that Ushry had been administered the SIRS test in June 2004, which showed that he was potentially malingering in five of the eight scales, was a "pretty good suggestion" that Ushry had been exaggerating his symptoms, if not outright lying about them. Dr. Hawkins concluded that while Ushry had a history of experiencing delusions, there was simply no evidence that Ushry had experienced the command hallucinations that he had reported.Thus, Dr. Hawkins believed that Ushry was exaggerating this symptom of his mental illness, if not totally malingering.
 {¶ 36} Dr. Hawkins acknowledged that Ushry's schizophrenia was probably more active and florid on the day of the offenses because he had not taken his antipsychotic medication and because he had smoked marijuana. In concluding that Ushry understood the wrongfulness of his actions on the night of the offenses, Dr. Hawkins focused on Ushry's behavior. He testified that Ushry was out of work, he needed money, and he was going to pawn his mother's jewelry to pay his rent. He made a direct effort to do this with Antonio and Alexis. When he discovered that the ring was missing, he went back to collect it. Thus, Dr. Hawkins testified, Ushry's actions were not based on delusions, but on reality.
 {¶ 37} Dr. Hawkins testified that, after collecting some of Antonio and Alexis's property and harming Alexis, Ushry then fled from the scene and went to his parents' home. When he got to their home, he told them that he had done something wrong so that they could help him. Thus, Ushry's actions were not the result of any command or delusion, but were volitional. Dr. Hawkins stated that Ushry's subsequent flight from the scene, along with his statements to his father that he might have hurt someone, showed that he was aware of the wrongfulness of his conduct.
 {¶ 38} Because there was a conflict of opinion about Ushry's mental state, the trial court, as the trier of fact, had the responsibility to weigh the credibility of the expert witnesses. The trial court chose to rely on the expert opinions of Drs. Dreyer and Hawkins, instead of the opinion of Dr. Nizny, in concluding that Ushry understood the wrongfulness of his actions on the night of the offenses. Because the record supports the trial court's conclusion, we cannot say that its decision finding Ushry sane at the time of the offenses was against the manifest weight of the evidence. As a result, we overrule his first assignment of error.
 III. Ineffective Assistance of Counsel {¶ 39} In his second assignment of error, Ushry argues that he was denied the effective assistance of counsel. To prevail on his claim, Ushry "must show that his counsel's representation fell below an objective standard of reasonableness"[2] and that he was prejudiced by counsel's deficient performance.[3] Prejudice is established by a showing "that there is a reasonable probability that, but for the errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome."[4] Both prongs must be met to demonstrate ineffective assistance of counsel.[5] Moreover, "it is presumed that a properly licensed attorney is competent and ineffective assistance cannot be based on debatable tactical decisions."[6]
 {¶ 40} Ushry claims that he was denied the effective assistance of counsel because his counsel failed to file a motion to suppress his oral and taped statements to police; because he failed to present evidence of his ongoing mental illness, including his discharge records from the military and his medical records from an antipsychotic drug study at University Hospital; and because he admitted during closing argument that Ushry had purposefully killed Alexis.
 {¶ 41} Defense counsel's failure to seek the suppression of Ushry's statements to the police could be viewed as trial strategy. Ushry's statements to the police about cameras in his apartment and people manipulating his genitalia several hours after Alexis's stabbing strongly supported his argument that he was so mentally impaired on the night of the murder that he could not have understood the wrongfulness of his actions. Ushry's own expert witness, Dr. Nizny, relied on Ushry's statements to police when formulating his opinion that Ushry was so mentally impaired on the night of the offenses that he could not understand the wrongfulness of his actions. And even if defense counsel had been able to successfully suppress his statements, the state had substantial eyewitness testimony and forensic evidence against him. Thus, Ushry has not demonstrated how his counsel's failure to pursue the motion to suppress prejudiced him.
 {¶ 42} With respect to Ushry's claim that his counsel should have presented more evidence regarding his mental illness, the record reveals that defense counsel provided the expert witnesses with some of Ushry's medical records from the military and the records from the drug study at University Hospital. Dr. Dreyer additionally testified that she had independently obtained some of Ushry's military records, which defense counsel examined during his recross-examination of Dr. Dreyer at trial. While these medical records helped to form the basis of the expert witnesses' opinions, they were not separately entered into evidence, but merely summarized in their respective reports. Thus, we have no way of independently knowing what any of these records contained.
 {¶ 43} Furthermore, whether defense counsel's production of additional records and/or testimony regarding Ushry's mental illness would have aided his affirmative defense is purely speculative, since this court has no way of knowing what, if anything, would have been discovered if the records or the testimony had been pursued. Because Ushry cannot establish prejudice in the absence of this information, we cannot conclude in his direct appeal that defense counsel rendered ineffective assistance. Ushry's claim is more suitable to postconviction relief, where this additional evidence could be presented.
 {¶ 44} Finally, Ushry contends that defense counsel rendered ineffective assistance when he stated during closing argument that he "would have difficulty arguing that there wasn't a purposeful homicide in this case." Defense counsel further stated that "because of the coroner's testimony and the number of wounds that were inflicted, it's easy to conclude that there was a purposeful killing." Ushry contends that defense counsel's admission was extremely prejudicial because it relieved the state of its burden to prove him guilty beyond a reasonable doubt of one of the elements of aggravated murder as charged in count one.
 {¶ 45} During closing argument, defense counsel argued that while he would have difficulty arguing that Ushry had not committed a purposeful homicide, the evidence simply did not support the state's argument that Ushry had acted with prior calculation and design, given the expert testimony about his mental state at the time of the offenses. Defense counsel's strategy was ultimately successful, as the trial court did not find Ushry guilty of aggravated murder with prior calculation and design as charged in count one, but guilty of the lesser-included offense of murder. Thus, we fail to see how defense counsel's comments prejudiced Ushry. Because Ushry has failed to demonstrate that the actions or inactions of defense counsel were ineffective, we overrule his second assignment of error.
 IV. Prosecutorial Misconduct {¶ 46} In his third assignment of error, Ushry claims that three separate comments made by the assistant prosecutor during the rebuttal portion of closing argument denied him a fair trial. Ushry argues that the prosecuting attorney improperly bolstered the credibility of the state's witnesses and damaged the credibility of his expert witness when he referred to his expert witness as the "infamous Dr. Nizny," while characterizing the state's expert witnesses as "well respected." Next, Ushry argues that the assistant prosecutor improperly characterized his statements to his father immediately following the stabbing and made hearsay statements regarding a 911 tape that was not in evidence. Finally, Ushry maintains that the assistant prosecutor erroneously commented that Dr. Dreyer's testimony regarding the SIRS test provided clear evidence that he was exaggerating his mental illness.
 {¶ 47} The test for prosecutorial misconduct is whether the prosecutor's remarks were improper, and if so, whether they prejudicially affected the defendant's substantial rights.[7]
Considerable latitude is generally afforded to the prosecutor in presenting closing arguments.[8] The prosecutor's closing argument must be reviewed in its entirety to determine if the remarks were prejudicial.[9] Because Ushry did not object to the last two remarks, we must review the alleged misconduct for plain error. Thus, we must be convinced that Ushry would not have been convicted but for the alleged misconduct in order to reverse his conviction.[10] Moreover, "[i]n a bench trial, the trial court is presumed to rely only on relevant, material evidence in arriving at its conclusion."[11]
 {¶ 48} We have reviewed the state's closing argument in its entirety, and we can find nothing to indicate that the trial court was influenced by the comments of the assistant prosecutor in arriving at its findings of guilt. We, therefore, overrule Ushry's third assignment of error. Having found no merit to Ushry's three assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
[1] State v. Johnson, 1st Dist. Nos. C-020256 and C-020257, 2003-Ohio-3665, at ¶ 41; see, also, State v. Honnaker, 1st Dist. No. C-040684, 2006-Ohio-1374, at ¶ 5.
[2] See Strickland v. Washington (1984), 466 U.S. 668, 688,104 S.Ct. 2052.
[3] See id. at 687.
[4] See id. at 694.
[5] See id. at 697.
[6] State v. Bond (Oct. 29, 1999), 1st Dist. No. C-990195.
[7] State v. Smith (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883.
[8] Id. at 13.
[9] State v. Rahman (1986), 23 Ohio St.3d 146, 154,492 N.E.2d 401.
[10] State v. Murrell, 1st Dist. No. C-020333, 2003-Ohio-2068, ¶ 2.
[11] State v. Lane (1995), 108 Ohio App.3d 477, 484,671 N.E.2d 272.