OPINION. *Page 2 
{¶ 1} Defendant-appellant Larry Lewis, Jr., appeals from his conviction, following a jury trial, for the murder of Kevin "Fresh" Berry, with an accompanying firearm specification. On the evening of April 1, 2005, Lewis and co-defendant Chaz Minor[1] shot Berry to death for selling marijuana on their territory in the Fay Apartments. Lewis and Minor were tried together. At trial, Jamita Weaver and Geronimo Johnson identified Lewis as one of the perpetrators. Lewis's cellmate also testified that Lewis had admitted killing Berry.
 {¶ 2} Raising four assignments of error, Lewis now argues that (1) the trial court erred by permitting the state to introduce unproved allegations of witness intimidation and to comment on these allegations in its opening and closing arguments; (2) the trial court deprived him of his Sixth Amendment right to confront out-of-court declarants identifying him as Berry's killer; (3) he was denied the effective assistance of counsel; and (4) his conviction was contrary to the manifest weight of the evidence and was based upon insufficient evidence. We find none of the assignments to involve reversible error and thus affirm the trial court's judgment.
 I. The Murder of Kevin "Fresh" Berry {¶ 3} Berry was known to sell high-quality marijuana in downtown Cincinnati. In March and April 2005, he began to sell it in the Fay Apartments, located in the Winton Terrace neighborhood of Cincinnati. A number of Fay Apartments denizens also sold marijuana there, frequently from "candy stores," apartments from which they sold candy, *Page 3 
snacks, cigarettes, and marijuana. Fay Apartments marijuana sellers were concerned about Berry "taking [their] licks," or selling drugs in their territory.
 {¶ 4} Johnson lived in the Fay Apartments with his sister, Montoya. He ran a candy store from his sister's apartment. Lewis purchased cigars from their store. On the day before Berry died, and following an argument with Johnson's sister's ex-boyfriend, Hakeem, Lewis drew his .45-caliber handgun and engaged in a roving gun battle with Hakeem at the Fay Apartments. Lewis fired into the apartment occupied by Montoya.
 {¶ 5} At trial, Johnson testified that on the night of the shooting, from the vantage point of his girlfriend's apartment window, he had observed Berry, Lewis, and a third man arguing. Lewis chided Berry, "You can't be up here." Berry explained that he was trying to leave. Johnson then saw Lewis approach Berry and draw a handgun from his clothing. As Johnson left the window to ensure that his girlfriend and her child were safe, he heard shots from two different guns. The first shots were very loud. After the shooting stopped, Johnson watched as Lewis and his companion looked over Berry's body "to see if the job was finished." Johnson did not report any of his observations to the police until two weeks later.
 {¶ 6} Police expert witnesses testified that Berry died from shots to his heart inflicted by 7.62-mm rifle rounds. Minor was known to carry a 7.62-mm SKS assault rifle. While numerous .45-caliber shell casings were also found at the scene, no weapon was recovered.
 {¶ 7} Weaver also lived at the Fay Apartments. She knew Minor and Lewis. She also had begun to purchase marijuana from Berry. At trial, Weaver testified that, on the evening of the murder, she had overheard Lewis complain to others at the Fay Apartments, including a man named Tremus and Weaver's brother, Dante Graves, that he *Page 4 
did not like Berry "taking [their] licks," or selling drugs in their territory. Lewis also declared, "He can't eat up here. * * * We got to take care of it."
 {¶ 8} As Berry stood near his parked car, Weaver made arrangements to purchase marijuana. While she was talking to Berry, Minor and Lewis approached. Minor appeared to limp, which indicated to her that he might have been concealing a weapon in his pants. Minor told Weaver not to buy marijuana from Berry. Berry complained that she could buy from whomever she chose. Weaver testified that Lewis then accused Berry of "stealing licks again," or stealing marijuana customers.
 {¶ 9} As the argument continued, Weaver began to walk away, and she heard Lewis instruct Minor, "Do what you got to do." Minor used two hands to retrieve a "big gun" from his pants. Lewis drew a handgun. Weaver testified, "It kind of happened fast. They pulled they stuff out, and that's — I kind of seen [Berry] trying to go for his, then they just started shooting, but it was too late." She heard very loud reports followed by less "powerful" ones. She saw Berry "all balled up" and ran for her apartment.
 {¶ 10} Minutes later, Graves and Minor demanded to be admitted to Weaver's apartment. She refused to admit them but observed Minor hand a rifle to her brother. Despite being only feet away from the shooting, she too did not immediately inform the police of what she had seen.
 {¶ 11} Hasson Graham, who had known Lewis for six years, had been incarcerated with Lewis at the Hamilton County Justice Center. At trial, he testified that Lewis had admitted to shooting Berry, and that Lewis had planned to implicate Diamond Johnson, Chaz Minor's brother, in the murder.
 {¶ 12} Cincinnati Police Detectives Hilbert and Van Holle testified at trial about the details of their investigation, including their multiple interrogations of Lewis. As part *Page 5 
of this testimony, they recounted statements that Lewis had made to them. In describing their questioning of Lewis, the detectives informed the jury that they had told Lewis that unnamed witnesses had identified him as one of Berry's killers.
 {¶ 13} Minor testified at the trial and offered an alibi defense. Lewis did not offer a defense.
 {¶ 14} At the conclusion of the trial, the jury returned guilty verdicts on the murder charge and the firearm specification. The trial court sentenced Lewis to three years' imprisonment on the firearm specification to be served consecutively to a 15-year-to-life term for the murder. These sentences were to be served consecutively to sentences imposed for separate felony offenses not at issue in this appeal.[2]
The cumulative sentence was imprisonment for 27 years to life.
 II. Witness-Intimidation Evidence {¶ 15} In his first assignment of error, Lewis asserts that the trial court erred in permitting the state to introduce unproved allegations of threats made against prosecution witnesses Weaver and Johnson and to improperly comment on these allegations in its opening and closing arguments.
 {¶ 16} The test for whether prosecutorial misconduct mandates reversal is whether remarks or actions were improper, and if so, whether they prejudicially affected the substantial rights of the accused.[3] The central element of prosecutorial-misconduct analysis is "whether the conduct complained of deprived the defendant of a fair trial."[4] *Page 6 
Because Lewis did not object to the state's comments in opening or closing argument, our review is limited to whether the prosecutor's remarks rose to the level of plain error.[5] Thus, to reverse his conviction, we must be convinced that Lewis would not have been convicted but for the alleged misconduct.[6]
 {¶ 17} In its opening statement, the state informed the jury of the difficulty of prosecuting violent crimes at the Fay Apartments because "[n]obody wants to get involved. Everybody is scared. Nobody wants to come forward and pinpoint somebody." At trial, both Weaver and Johnson described their fear in coming forward to identify Berry's killers. Johnson stated that he was scared about his physical well-being and relayed that his life had been "hell" since he had spoken to the police. He stated that he "was scared because of what was told to me."
 {¶ 18} Weaver, then 19 years old, testified that she had no permanent address after the killing "because of my safety." Her mother, who retained custody of Weaver's children, would not let her visit because of safety concerns. On redirect examination, Weaver explained why she had not reported her knowledge of the killing immediately. She stated that it was "[b]ecause I was scared and I was still living in the Fay. And you just can't come out and tell on people if you still living in that same area and those people weren't caught."
 {¶ 19} The state offered Weaver's and Johnson's fear of retribution as an explanation for their failure to come forward immediately and to counter Lewis's theory of the case that Weaver and Johnson had come forward to identify Lewis not because he had killed Berry but because of other grievances that they had with Lewis. *Page 7 
 {¶ 20} In his opening statement, Lewis had told the jury "that behind the testimony of all these witnesses are some very questionable motives. Not only is their motivation questionable, but also their ability to see and perceive the things that they're going to testify to that they saw." Lewis and Minor then conducted extensive cross-examination of Weaver and Johnson, particularly employing their police statements to reveal their motivation to fabricate testimony.
 {¶ 21} Despite being at the shooting, Weaver did not come forward until after she had had a violent dispute with her brother over custody of her children. Her brother was Minor's close friend. Similarly, Johnson was angry with Lewis for the March 31 gunfight with Hakeem, which had endangered his sister. Lewis's cross-examination of Graham revealed that he had been upset with Lewis over the theft of Graham's personal items, and that Graham stood to gain consideration for his own case in exchange for his testimony against Lewis. Lewis highlighted additional defects in the witnesses' credibility. Weaver, for example, was at the crime scene because she was attempting to buy $10 of marijuana from Berry for her 13-year-old friend.
 {¶ 22} The state's objection, raised in Lewis's closing argument, that no money or drugs had been found on Berry, was overruled after a discussion at sidebar. This single objection was not improper, and especially in light of the trial court's reversal of its initial ruling sustaining the state's objection, it did not prejudicially affect Lewis's substantial rights.[7]
 {¶ 23} In State v. Grimes, this court acknowledged that prosecution argument about witness intimidation, while often problematic, can serve to explain why witnesses have not immediately come forward to the police with information about a murder.[8] In *Page 8 
light of the defense claims in this case that the witnesses "had a bone to pick" with Lewis, the prosecution did not err in commenting on witness intimidation in its opening or closing argument.
 {¶ 24} Similarly, the introduction of witness-intimidation evidence was not error. Most of the evidence of threats came from the direct testimony of Weaver and Johnson. For example, Johnson testified, over multiple objections and following a sidebar discussion, that two weeks after the killing Ron Deanna and Tremus had approached him as he reported to his probation officer. They made statements to Johnson that scared him to the point that he refused to leave the office. The trial court sustained objections and carefully limited Johnson's testimony about the specific statements made by others and about his identification of either defendant as the one making threats.
 {¶ 25} The evidence was proper to explain why the witnesses had not initially come forward[9] and to rebut Lewis's contention, made in opening statement, that Weaver and Johnson had "questionable motives" and "had a bone to pick" with Lewis.[10] The first assignment of error is overruled.
 III. Confrontation of Out-of-Court Declarants {¶ 26} In his second assignment of error, Lewis contends that the trial court erred when it admitted evidence that unidentified witnesses had threatened Weaver and Johnson, and that unidentified witnesses had told Detectives Hilbert and Von Holle that Lewis and Minor had killed Berry. Without an opportunity to confront *Page 9 
these out-of-court declarants, Lewis claims, he was deprived of hisSixth Amendment rights in violation of the rule announced inCrawford v. Washington.[11]
Testimonial Statements Must be Tested by Confrontation {¶ 27} The Sixth Amendment to the United States Constitution states, "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." In Crawford v.Washington, the United States Supreme Court equated witnesses with those who "bear testimony" against the accused and thus make "a declaration or affirmation * * * for the purpose of establishing or proving some fact."[12]
 {¶ 28} After reviewing the historical antecedents of the Confrontation Clause, including the principal evil the clause was meant to remedy, the "use of ex parte examinations as evidence against the accused,"[13]
the Supreme Court concluded that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one that the Constitution actually prescribes: confrontation. "[14]
 {¶ 29} The Court held that the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination."[15] The Court overruled, in part, its previous decision in Ohio v. Roberts,[16] which had permitted the *Page 10 
admission of statements made by unavailable witnesses against criminal defendants if the statements bore "adequate `indicia of reliability.' "[17]
What Statements Are Testimonial? {¶ 30} In Crawford and its progeny, the Court drew a distinction between testimonial and nontestimonial hearsay, and limited its holding to the former.[18] The right to confrontation does not extend to nontestimonial hearsay[19] because that form of hearsay does not implicate the "Sixth Amendment's core concerns."[20] "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law--as does Roberts, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether."[21]
Thus the threshold inquiry in our analysis is whether the challenged out-of-court statements in this case were testimonial in nature and needed to be tested by confrontation.
 {¶ 31} While the Crawford court declined to "spell out a comprehensive definition of `testimonial,' " it stated that the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."[22] InState v. Nix, this court explained that a testimonial statement could be broadly defined as being the result of an "official examination."[23]
In subsequent decisions, the United States Supreme Court and the Ohio Supreme Court have refined the definition of a testimonial statement to include statements "made `under circumstances which would *Page 11 
lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' "[24] Thus statements made to police without an ongoing emergency are testimonial "when the circumstances objectively indicate that * * * the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. "[25]
Nontestimonial Statements Made to Weaver and Johnson {¶ 32} Lewis first argues that the trial court erred when it allowed hearsay evidence of threats against Weaver and Johnson when those making the threats — presumably out-of-court declarants — had not been available for confrontation and cross-examination.
 {¶ 33} While Weaver did relate the facts of her brother's attack on her, she did not testify about any specific statement made by another threatening retribution if she testified against Lewis or Minor. In response to the state's questioning, however, Johnson began to relate to the jury the substance of threatening statements made to him by Tremus and Deanna outside the probation office. But the trial court sustained each of Lewis's five prompt objections to these hearsay statements. Johnson was warned not to relate what others had said, and the jury was told that the statements "are not in this case." Error cannot be predicated on objections that have been sustained by the trial court.[26]
 {¶ 34} The majority of Weaver's and Johnson's remaining testimony recounted their own fears for their safety based upon incidental comments by those in their community and upon their understanding of life in the Fay Apartments. The testimony *Page 12 
was based largely on their direct observations, or it was not offered for its truth, but for its effect on Weaver and Johnson to explain why they had not initially come forward.
 {¶ 35} These remaining statements did not threaten to bring into court the ex parte "abuses the Confrontation Clause targeted."[27]
"[O]ff-hand, overheard remark[s]" and "casual remark[s] to an acquaintance," unlike statements made to the police, do not implicate the Sixth Amendment's "core concerns."[28] Therefore, Weaver's and Johnson's statements were nontestimonial statements for purposes ofCrawford and were not barred even though Lewis did not have the opportunity to confront the out-of-court declarants.[29]
Testimonial Statements Made to Police Detectives {¶ 36} Lewis next challenges the in-court testimony of police detectives who recounted their questioning of Lewis. Lewis has identified only two statements by the detectives that implicated his right to confront out-of-court witnesses against him.[30]
 {¶ 37} During his cross-examination, Detective Hilbert stated, based upon "the person that we got the information from," that Minor had stuck the rifle he used to shoot Berry back into his pant leg and had thus "limped" away from the car.
 {¶ 38} During Detective Von Holle's direct examination by the state, he recounted his questioning of Lewis. During the questioning, Lewis had implicated Diamond Johnson, Chaz Minor's brother, and Styles Hummons as Berry's murderers. He told the detective that he had given .45-caliber ammunition, similar to that recovered at the crime scene, to Hummons before Berry's murder. The state then asked the detective, "Did you confront Mr. Lewis with the fact that there had been eyewitnesses that placed *Page 13 
him at the scene firing at [Berry]?" Detective Von Holle answered, "I did." Detective Von Holle continued, "I told Larry Lewis there were eyewitnesses to himself and Chaz Minor at the scene of the crime. * * * I told him * * * witnesses say that it wasn't Diamond that walked up here. It was Chaz Minor. And witnesses say this wasn't Styles Hummons that walked up here, it was you that walked up there and shot him." Lewis maintained that Diamond Johnson and Hummons had killed Berry.
 {¶ 39} Lewis did not object to these hearsay statements.[31] Failure to object to the admission of evidence at trial ordinarily constitutes a waiver of any objection upon appeal.[32] Thus, for any such error to be cognizable on appeal, it would have to rise to the level of plain error.[33] Even if such an error is a constitutional one, we review it under a plain-error analysis.[34] To constitute plain error, (1) there must be an error, (2) the error must be an "obvious" defect in the trial proceedings, and (3) the error must affect "substantial rights."[35]
The Ohio Supreme Court has interpreted this final element to mean "that the trial court's error must have affected the outcome of the trial."[36]
 {¶ 40} The out-of-court statements brought into court by Detectives Hilbert and Von Holle were testimonial for purposes of analysis under the Sixth Amendment and must have been subject to confrontation before their admission.[37] An objective witness would reasonably have concluded that statements that he or she had made to police detectives, at some considerable time after the event, identifying the perpetrators of a *Page 14 
murder would have been available for use at a later trial,[38] or would have been used to establish or prove past events potentially relevant to later criminal prosecution.[39] Indeed a statement made to the police "that describes criminal activity is almost always testimonial."[40]
 {¶ 41} The state does not assert that the statements were not testimonial in nature. Rather the state correctly notes that the Confrontation Clause does not prohibit the introduction of all out-of-court testimonial statements by witnesses who are unavailable and have not been subject to confrontation. In Crawford, the Court stated that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."[41] Ohio and federal courts have permitted the introduction of testimonial statements not subjected to prior confrontation where the testimony merely provided background information or a context for the investigation,[42] explained a detective's conduct while investigating a crime,[43] gave meaning to the otherwise admissible responses of the defendants,[44] or served solely to impeach a witness.[45] In many of these instances, in ruling on a contemporaneous objection to the admission of the out-of-court statements, the trial court informed the jury that the statements were not being offered for the truth of the matter asserted and instructed the jury on the constitutionally permissible use of the statements.[46] *Page 15 
 {¶ 42} Here the state contends on appeal that the statements were not offered for their truth but rather "to explain how the investigation led [the detectives] to Lewis and Minor," or to explain "what actions [the detectives] took as a result of these statements."[47] We disagree.
 {¶ 43} The detectives had already focused on Lewis and Minor as the murderers at the time of the questioning. The "information" statement that Detective Hilbert told the jury about came from at least the second round of questioning Lewis. Lewis's trial counsel was present during one of the interrogations. The "you walked up there and shot him" statement made by unknown witnesses and introduced in Detective Von Holle's testimony occurred during a third questioning of Lewis on October 25, 2005.
 {¶ 44} Unlike those situations where a confidential informant relays to police the defendant's incriminating statements, here the witness statements — that Lewis and Minor had murdered Berry — were made outside of Lewis's presence and thus could not have been offered to give a context for his own words or actions. Unlike statements that serve only to explain how certain milestones in the investigation came to pass, the witnesses' testimonial statements here were used to show that the state knew that Lewis and Minor had killed Berry, and that Lewis should have told the truth and confessed to killing Berry or identified the true killer. This was the very heart of the state's case. The exclusion of ex parte examinations as evidence against the accused is the primary aim of the Confrontation Clause.[48] Thus, the admission of the testimony was error.
 {¶ 45} But in light of the lack of a definitive pronouncement from the highest courts, as well as the rapidly developing case law on the application of Crawford to police *Page 16 
interrogations, the error was not an obvious one when it was made.[49]
More importantly, the error did not affect the outcome of the trial. Unlike the situation where the only identification testimony is adduced from an unavailable out-of-court declarant not subject to confrontation, here the live in-court testimony of two witnesses provided independent evidence of Lewis's guilt. Moreover, Lewis's failure to make a timely objection precluded the state from offering an alternative justification for the testimonial statements. The failure also foreclosed the trial court from the opportunity to correct and avoid any error by giving a limiting or cautionary instruction to the jury.
 {¶ 46} As the other evidence in this case convincingly showed that Lewis was guilty, it was not plain error to admit the challenged evidence. The assignment of error is overruled.
 IV. Effective Assistance of Counsel {¶ 47} In his third assignment of error, Lewis contends that he was denied the effective assistance of counsel when his trial counsel failed to object to the witness-intimidation evidence and argument and to object to argument concerning the charge involved in Lewis's separate prosecution for discharging a firearm into Montoya Johnson's habitation. To prevail on a claim of ineffective assistance of trial counsel, an appellant must show first that trial counsel's performance was deficient and, second, that the deficient performance was so prejudicial that he was denied a reliable and fundamentally fair proceeding.[50] A reviewing court will not second-guess trial strategy and must indulge *Page 17 
a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.[51]
 {¶ 48} Here, experienced trial counsel had a clear strategy to discredit the state's identification witnesses — Weaver and Geronimo Johnson — and to offer an alternative explanation for their identification of Lewis. Counsel also filed a motion in limine to restrict the use of Lewis's discharge-into-a-habitation offense and to exclude inquiry at trial about Lewis asking Graham how to beat a lie-detector test. He strenuously objected to the hearsay components of the threat testimony and conducted a spirited defense. After reviewing the entire record, we hold that counsel's efforts were not deficient and that Lewis was not prejudiced in any significant way. The result of the trial was reliable and fundamentally fair. The third assignment of error is overruled.
 V. Weight and Sufficiency of the Evidence {¶ 49} In his fourth assignment of error, Lewis challenges the weight and the sufficiency of the evidence adduced to support the murder conviction. A review of the record fails to persuade us that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.[52] The jury was entitled to reject Lewis's theory that there was no credible evidence that he had shot Kevin Berry. As the weight to be given the evidence and the credibility of the witnesses were primarily for the trier of fact to determine, the jury, in resolving conflicts in the testimony, could properly have found Weaver's and Johnson's identification testimony credible.[53] *Page 18 
 {¶ 50} The test for the sufficiency of the evidence required to sustain a conviction was enunciated by the United States Supreme Court in Jackson v. Virginia.[54] The relevant question is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[55]
 {¶ 51} As the record reflects substantial, credible evidence from which the trier of fact could have reasonably concluded that all the elements of the charged crime had been proved beyond a reasonable doubt, including that Lewis had purposely killed Berry with a firearm, the assignment of error is overruled.
 {¶ 52} Therefore, the trial court's judgment is affirmed.
Judgment affirmed. HILDEBRANDT, P.J., and WINKLER, J., concur.
RALPH WINKLER, retired, from the First Appellate District, sitting by assignment.
[1] This court affirmed Minor's conviction in a separate appeal. SeeState v. Minor, 1st Dist. No. C-060043, 2007-Ohio-312.
[2] This court affirmed the sentences imposed for these separate felony offenses, including a sentence for improperly discharging a weapon into Montoya Johnson's habitation, in State v. Lewis (Mar. 14, 2007), 1st Dist. Nos. C-060008 and C-060009. Lewis did not contest his guilt in these appeals.
[3] See State v. Bey, 85 Ohio St.3d 487, 493, 1999-Ohio-283,709 N.E.2d 484.
[4] State v. Fears, 86 Ohio St.3d 329, 332, 1999-Ohio-111,715 N.E.2d 136, 143, citing State v. Apanovitch (1987), 33 Ohio St.3d 19, 24,514 N.E.2d 394.
[5] See Crim.R. 52(B).
[6] See State v. Ushry, 1st Dist. No. C-050740, 2006-Ohio-6287, at ¶ 47.
[7] See State v. Bey, 85 Ohio St.3d at 493, 1999-Ohio-283,709 N.E.2d 484.
[8] 1st Dist. No. C-030922, 2005-Ohio-203, at ¶ 15 and 58.
[9] See State v. Grimes, 2005-Ohio-203, at ¶ 58; see, also, State v.Nix, 1st Dist. No. C-030696, 2004-Ohio-5502, at ¶ 42-44, jurisdictional motion overruled, 105 Ohio St.3d 1496, 2005-Ohio-1666,825 N.E.2d 621.
[10] See State v. Minor, 2007-Ohio-312, at ¶ 15.
[11] (2004), 541 U.S. 36, 124 S.Ct. 1354.
[12] Id. at 51 (quotation omitted).
[13] Id. at 50.
[14] Id. at 68-69.
[15] Id. at 53-54.
[16] (1980), 448 U.S. 56, 100 S.Ct. 2531.
[17] See Crawford, 541 U.S. at 40, 124 S.Ct. 1354; see, also,State v. Lee, 162 Ohio App.3d 648, 2005-Ohio-3395, 834 N.E.2d 825, at ¶ 14 (Crawford also appeared to overrule White v. Illinois [1992],502 U.S. 346, 112 S.Ct. 736, which held that hearsay was admissible under the Confrontation Clause as long as the hearsay had a sufficient guarantee of reliability).
[18] See Crawford, 541 U.S. at 68, 124 S.Ct. 1354.
[19] See State v. Stahl, 111 Ohio St.3d 186, 2006-Ohio-5482,855 N.E.2d 834, at ¶ 21.
[20] Crawford, 541 U.S. at 51, 124 S.Ct. 1354.
[21] Id. at 68.
[22] Id. at 68.
[23] 2004-Ohio-5502, at ¶ 73.
[24] State v. Stahl, paragraph one of the syllabus, quotingCrawford at 52.
[25] Davis v. Washington (2006), __ U.S. __, __, 126 S.Ct. 2266,2273-2274.
[26] See State v. Austin (Dec. 17, 1986), 1st Dist. No. C-860148; see, also, State v. Davie, 80 Ohio St.3d 311, 1997-Ohio-341, 686 N.E.2d 245, at ¶ 98.
[27] Crawford, 541 U.S. at 51, 124 S.Ct. 1354
[28] Id.
[29] See State v. Minor, 2007-Ohio-312, at ¶ 21.
[30] See App.R. 16(A)(7) (appellant is required to include, in his brief, references in the record relating to the alleged error).
[31] We note that Lewis raised, and the trial court sustained, an objection to the detective's subsequent characterization of whether Lewis had intended to kill Berry.
[32] See Evid.R. 103(A)(1).
[33] See Evid.R. 103(D) and Crim.R. 52(B).
[34] See State v. Lee, 2005-Ohio-3395, at ¶ 10, and United States v.Cromer (C.A.6, 2004), 389 F.3d 662, 672 (applying plain-error analysis to a Sixth Amendment violation).
[35] State v. Barnes, 94 Ohio St.3d 21, 27, 2002-Ohio-68,759 N.E.2d 1240.
[36] Id.
[37] But, see, State v. Minor, 2007-Ohio-312, at ¶ 22 (holding, without discussion, the same statements to be nontestimonial).
[38] See State v. Stahl, paragraph one of the syllabus.
[39] See Davis v. Washington, __ U.S. at __,126 S.Ct. at 2273-2274.
[40] United States v. Cromer, 389 F.3d at 675 (quotation and citation omitted).
[41] Crawford at 36, fn. 9, citing Tennessee v. Street (1985),471 U.S. 409, 414, 105 S.Ct. 2078; see, also, State v. Jordan,167 Ohio App.3d 157, 2006-Ohio-2759, 854 N.E.2d 520, at ¶ 47.
[42] See State v. Keene, 9th Dist. No. 06CA008880, 2006-Ohio-6676, at ¶ 24.
[43] See State v. Woods (Aug. 17, 2006), 10th Dist. No. 05AP-704, appeal not accepted for review, 112 Ohio St.3d 1443, 2007-Ohio-152,860 N.E.2d 767, and State v. Djuric, 8th Dist. No. 87745, 2007-Ohio-413, at ¶ 47.
[44] See State v. Smith, 162 Ohio App.3d 208, 2005-Ohio-3579,832 N.E.2d 1286, at ¶ 13 (8th Dist.); see, also, United States v.Sexton (C.A.6, 2005), 119 Fed.Appx. 735, 741-743.
[45] See State v. Jordan at ¶ 47.
[46] See, e.g., United States v. Sexton, 119 Fed.Appx. at 743, andState v. Woods, supra.
[47] Appellee's Brief at 11-12.
[48] See State v. Shisler, 1st Dist. Nos. C-050860 and C-050861,2006-Ohio-5265, at ¶ 13, citing Crawford at 50.
[49] See State v. Barnes, 94 Ohio St.3d at 28, 2002-Ohio-68,759 N.E.2d 1240.
[50] See Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052; Lockhart v. Fretwell (1993), 506 U.S. 364, 369-370, 113 S.Ct. 838;State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.
[51] See State v. Mason, 82 Ohio St.3d 144, 157-158, 1998-Ohio-370,694 N.E.2d 932.
[52] See State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[53] see State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.
[54] (1979), 443 U.S. 307, 99 S.Ct. 2781.
[55] See id. at 319; see, also, State v. Conway, 108 Ohio St.3d 214,2006-Ohio-791, 842 N.E.2d 996, at ¶ 36. *Page 1