OPINION
{¶ 1} Defendant-appellant, Aaron J. Swank, appeals from the May 15, 2003 judgment entry of the Franklin County Court of Common Pleas finding him guilty on two counts of involuntary manslaughter with specification, kidnapping with specification, and felonious assault. Appellant was sentenced to an aggregate term of 21 years, plus an additional three years for the use of a firearm. For the following reasons, we affirm the decision of the trial court.
 {¶ 2} On June 22, 2001, appellant was indicted on one count of murder, two counts of involuntary manslaughter, one count of felonious assault, one count of kidnapping, one count of aggravated robbery, all of which carried a specification, and one count of having a weapon while under disability.[1]
Appellant voluntarily waived his right to a jury trial and elected to be tried before the court. A bench trial commenced on March 24, 2003. Appellant testified in his own defense. The following facts were elicited from testimony at trial.
 {¶ 3} On the evening of April 29, 1997, Richard Stolzenburg and Daniel Cole were at The Friendly Tavern on Parsons Avenue in Columbus, Ohio. Richard testified that he and Daniel spent a "good portion of the night" at the tavern. (Vol. I, Tr. 203.) Two times during the night, Richard and Daniel left the tavern and drove over to Reinhard Avenue in order for Daniel to steal cocaine from a man named "Joe."[2] Each time, Daniel would return to the car with envelopes that contained 20 packages of "[s]mall amounts of cocaine already pre-wrapped and packaged for sale." (Tr. 204.) Daniel would sell one pre-wrapped package for $20 to patrons at the tavern. Richard testified that he and Daniel would use the money earned to buy drinks.
 {¶ 4} After Richard and Daniel returned to the tavern the second time, they engaged in conversation with two women. The two women invited both Richard and Daniel back to their place. Upon leaving the bar, "a pretty big guy" in a small blue Ford Fiesta, who "looked kind of mad," hollered for Daniel to approach the car. (Tr. 205.) Daniel approached the car, talked with the "pretty big guy" and then walked back over to Richard. Daniel told Richard that he was going to ride with the "pretty big guy." Richard pleaded for Daniel not to get in the car, because the guy looked "really, really upset" and was twice the size of Daniel. (Tr. 207.) Richard testified that after that night, he never saw Daniel again.
 {¶ 5} Also on the evening of April 29, 1997, Keaton Payne, Dawn Barrowman, Stephanie Coleman, and Michael "Mikey" Gordon were partying at appellant's house at 975 Heyl Avenue, Columbus, Ohio. Dawn smoked marijuana and drank beer, Stephanie took a total of seven to eight muscle relaxers while she drank about 10 or 12 beers, and Keaton drank about three to five beers.
 {¶ 6} During the course of the evening, Joe Platt came to appellant's house. Appellant, Keaton, and Mikey walked outside to have a conversation with Joe. Dawn testified that when the men walked back into the house, they were surrounding a white guy. (Vol. II, Tr. 349.) Stephanie testified that she looked up and saw appellant holding a gun to the white guy's head. (Tr. 420.) Stephanie further testified that she observed that the white guy appeared to be scared and was being forced by Mikey and appellant. The men walked through the house and went down to the basement. Dawn testified that Joe left after being in the basement for about 30 minutes and that Keaton left after being in the basement for only 20 minutes. Dawn testified that when Keaton came up from the basement to leave the house, he looked scared. (Tr. 353.) Keaton testified to hitting Daniel only one time. (Vol. I, Tr. 260.) Keaton testified that appellant and Mikey were "scuffling" with Daniel, "fighting with him, punching him." Id. According to Keaton, Daniel was pleading to leave and was unable to fight back because he was smaller than appellant, Mikey and Keaton.
 {¶ 7} After Keaton and Joe left appellant's house, appellant and Mikey were alone in the basement with Daniel. Both Dawn and Stephanie testified to hearing screaming coming from the basement. Dawn testified that it sounded like someone was being hurt. (Vol. II, Tr. 351.) Dawn further testified that she heard the screams, on and off, for a "couple of hours," (Tr. 355) while Stephanie testified that she heard screams on and off for "four to six hours." (Tr. 428.) Neither Dawn nor Stephanie called the police when they heard screams coming from the basement. According to Dawn, Mikey came upstairs from the basement and asked both her and Stephanie if either of them would help him clean up blood in the basement. (Vol. II, Tr. 360-361.) Both of them told him that they would not help. Both women testified that they never saw Daniel leave the house. Dawn testified that later that evening, both appellant and Mikey "were acting tough, and like they were hard, and they was saying that they had just killed this guy and threw him in the trash." (Tr. 362.) Dawn further testified that appellant told her, on the following day, that him and Mikey made Daniel get into the dumpster and that Mikey shot Daniel in the head. (Tr. 366.)
 {¶ 8} Appellant recounted a different series of events. Appellant testified that Mikey and Joe had a conversation in his kitchen, and then left his house to go and get Daniel out of the car. Appellant testified that he never left the front porch to walk to the car with Mikey and Joe to get Daniel. (Vol. III, Tr. 754.) After Mikey and Joe got Daniel out of the car, they came back up to appellant's house. Appellant followed the men back into the house. According to appellant, Mikey and Joe took Daniel down to the basement. Appellant testified that he stayed upstairs. (Tr. 757.) Appellant testified that he gave the men their privacy and did not go into the basement because he thought the men were in the process of buying/selling cocaine. (Tr. 757, 758.)
 {¶ 9} At the time appellant decided to head down to the basement, Joe was coming up the stairs. Appellant testified that Joe told him he was leaving. (Tr. 760.) Appellant walked Joe to the front door. Appellant testified that when he walked down to the basement, he observed Mikey and Daniel arguing and "trading punches back and forth." (Vol. III, Tr. 765.) Appellant tried to break up the fight. He testified that he only hit Daniel one time because Daniel would not shut up when appellant was trying to talk. (Vol. III, Tr. 764, 774.) Appellant testified that he did not notice any injuries on Daniel's body nor did he notice any blood on the floor. (Tr. 765.)
 {¶ 10} Appellant testified that he told Mikey and Daniel to "get the hell out of my house." (Tr. 766.) Appellant followed Mikey and Daniel outside to the backyard towards the alley. Appellant testified that Daniel walked outside on his own, following behind Mikey. (Tr. 767.) Appellant testified that Mikey took Daniel's shoes off his feet. (Tr. 767.) Appellant described that Mikey "scooped [Daniel] up and threw him in the open dumpster." (Tr. 770.) Appellant testified that Mikey shut the lid to the dumpster and proceeded to walk towards appellant. Mikey then turned back around, opened the lid and shot into the dumpster striking Daniel. Appellant testified that he did not kill Daniel. (Tr. 789.) Appellant further testified that no one had a gun when Daniel was brought up to the house and that he does not own a gun. (Tr. 807.) Daniel's body was found the next day, on April 30, 1997, at the Jackson Pike refuse facility.
 {¶ 11} Robert Taylor, Detective with the Columbus Division of Police, interviewed appellant. Detective Taylor testified that appellant, in his statement, indicated that at the time Daniel was being taken out of the car, a gun was pointed at him. Appellant further told the detective that he helped bring Daniel into the house and that he participated in the beating of Daniel, which lasted anywhere from 30 to 45 minutes. Detective Taylor testified that during the interview, appellant stated that he was approximately five feet from the dumpster having a conversation with Mikey before Mikey walked back to the dumpster and fired a shot at Daniel. (Vol. IV, Tr. 864.)
 {¶ 12} On April 10, 2003, the trial court found appellant not guilty of murder, but guilty of two counts of involuntary manslaughter with specification, kidnapping with specification, and felonious assault. Appellant was sentenced to an aggregate term of 21 years, plus three years for the gun specification. Appellant appeals from the trial court's judgment entry, assigning the following as error:
FIRST ASSIGNMENT OF ERROR
The evidence was insufficient to convict the defendant of the crime of involuntary manslaughter.
SECOND ASSIGNMENT OF ERROR
The court erred in permitting a detective to testify concerning a statement taken from the defendant when the best evidence of the statement, a tape recording, was readily available.
THIRD ASSIGNMENT OF ERROR
Where expert testimony cannot establish whether wounds and abrasions were caused before or after death, the evidence is not sufficient to establish a felonious assault.
 {¶ 13} In assignments of error one and three, appellant challenges the sufficiency of the evidence for the involuntary manslaughter and felonious assault convictions. The test we apply to determine whether a conviction is supported by sufficient evidence was restated by the Supreme Court of Ohio in State v.Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus:
An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (Jackson v. Virginia [1979], 443 U.S. 307, 99 S.Ct. 2781,61 L.Ed.2d 560, followed.)
 {¶ 14} The credibility of witnesses is primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230.
 {¶ 15} In his first assignment of error, appellant argues that the evidence and testimony at trial fails to establish the element of proximate cause as the death was not a legally foreseeable result of any prior activities of appellant. Appellant was convicted on two counts of involuntary manslaughter under R.C. 2903.04(A), which reads, in pertinent part:
No person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony.
 {¶ 16} In State v. Losey (1985), 23 Ohio App.3d 93, the court observed that, as used in R.C. 2903.04, the term "`proximate result' bears a resemblance to the concept of `proximate cause' in that [a] defendant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of the risk created by his conduct." Id. at 95, citing State v. Chambers (1977),53 Ohio App.2d 266, 272 (element of proximate cause is satisfied when the state proves that the defendant set in motion "a sequence of events, the foreseeable consequence of which were known or should have been known to him at the time"); see, also,State v. Lovelace (1999), 137 Ohio App.3d 206, 216 ("Generally, for a criminal defendant's conduct to be the proximate cause of a certain result, it must first be determined that the conduct was the cause in fact of the result, meaning that the result would not have occurred `but for' the conduct").
 {¶ 17} Foreseeability is determined from the perspective of what the defendant knew or should have known, when viewed in light of ordinary experience. Lovelace, supra. It is not necessary that the defendant be able to foresee the precise consequences of his conduct; only that the consequences be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by the defendant. Id. The Ohio involuntary manslaughter statute requires that the offender engage in conduct, which directly and proximately results in another's death.
 {¶ 18} Here, the trial court in essence determined that, but for appellant's criminal conduct, i.e., conspiring with Joe and Mikey to beat Daniel and inflict serious harm in retaliation for Daniel stealing drugs from Joe, the death would not have occurred. The state contends that it was reasonably foreseeable that as the beating of Daniel escalated and came to an end, he would be killed. We agree.
 {¶ 19} Testimony demonstrated that the felonious assault and kidnapping occurred at appellant's residence. Evidence revealed that appellant conspired with Joe and Mikey to beat Daniel in retaliation for Daniel stealing drugs from Joe. Appellant aided in bringing Daniel into his house. Upon entering the house, appellant was observed pointing a gun at Daniel's head. At some point during the evening, appellant participated in the beating of Daniel. Screams were heard from the basement that lasted, at minimum, 30 minutes. Daniel suffered injuries and there was evidence of blood in appellant's basement. After the beating, appellant and Mikey walked Daniel outside to the alley. Daniel's shoes were removed from his feet and he was thrown in the dumpster and then shot in the head. The bullet traveled through Daniel's head from right to left, and from back to front, in a slightly downward direction. Furthermore, appellant was heard bragging about the beating and the shooting of Daniel.
 {¶ 20} This evidence was sufficient to permit the trial judge to reasonably find that appellant's felonious assault and kidnapping of Daniel set in motion a sequence of events, which could foreseeably result in Daniel's death. After viewing the evidence in a light most favorable to the state, a rational trier of fact could have found the essential elements of the crime of involuntary manslaughter proven beyond a reasonable doubt.
 {¶ 21} Appellant additionally argues that the expert testimony of the coroner was insufficient to establish the elements of felonious assault. The law in Ohio on felonious assault, reads in pertinent part, that: "(A) No person shall knowingly do either of the following: (1) Cause serious physical harm to another or to another's unborn." R.C. 2903.11. "Serious physical harm," under R.C. 2901.01(5) means any of the following:
(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
(b) Any physical harm that carries a substantial risk of death;
(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.
 {¶ 22} In this case, appellant maintains that the evidence is insufficient because there is no reliable evidence that he caused serious physical harm to Daniel and there were no direct witness testimony to the beating.
 {¶ 23} From the testimony presented by the state, it is clear that a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Keaton, appellant's friend, testified that he observed appellant scuffling, fighting, and punching Daniel in his upper body. (Vol. I, Tr. 260.) The detective testified that appellant admitted to beating Daniel for 30 to 45 minutes. Both Dawn and Stephanie testified that they heard screams coming from the basement. Dr. Fardal, the coroner, established that in addition to the gunshot wound, Daniel had "blunt force injuries which include abrasions, contusions and lacerations." (Vol. II, Tr. 476.) Daniel suffered a number of injuries to his head and trunk, marked swelling to his nose, and an abraded laceration between his nose and lips. Dr. Fardal testified that some of the injuries to Daniel's body were consistent with that of someone who was the victim of an assault or a beating. (Tr. 500, 501.) Dr. Fardal indicated that some of Daniel's injuries were peri-mortem, "some of [the injuries] could be * * * before he received a gunshot wound to his head." (Tr. 501.) Dr. Fardal testified that if these injuries were sustained while Daniel was alive, that these injuries could have caused pain. Dr. Fardal concluded by stating that the peri-mortem injuries are consistent with Daniel being beaten by two or more individuals just prior to being shot in the head.
 {¶ 24} While appellant maintains that he only hit Daniel once, such credibility issues must be resolved by the trier of fact. DeHass, supra. Clearly, when this evidence is viewed in a light most favorable to the state, we must conclude that there was sufficient evidence to support the conviction for felonious assault. The punches thrown by appellant at Daniel satisfy R.C.2903.11(A)(1). As such, the evidence was sufficient to convict appellant of felonious assault. Accordingly, appellant's first and third assignments of error lack merit and are not well-taken.
 {¶ 25} In his second assignment of error, appellant contends that the trial court erred in permitting the detective to testify, on rebuttal, concerning a statement made by appellant when a tape recording of appellant's interview was available, under Evid.R. 1002, which provides:
To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio.
 {¶ 26} Defense counsel is not objecting to or assigning as error the listening to the tape recording. Rather, counsel's objection is to the testimony and admission of Detective Taylor's written summary. Appellant maintains that the detective's written synopsis of the taped recording was highly inaccurate and flawed. Appellant was given the opportunity to introduce the tape-recorded interview to impeach the detective. However, appellant failed to do so. Appellant did, however, cross-examine Detective Taylor on the allegedly inaccurate portions of his written synopsis. While appellant maintains that the tape recording is the "best evidence" of the detective's faulty synopsis of the events, appellant did not want to play the tape in its entirety because appellant felt that some of his statements were inadmissible and prejudicial. The trial judge instructed defense counsel that after the state's rebuttal of the detective, defense counsel would have the opportunity to play the tape. (Vol. IV, Tr. 855.) Appellant never introduced the tape. The trial court told both counsel, "because this is a trial without a jury, the Court has decided that the Court will hear the tape in its entirety and consider only those statements that are relevant and probative, and disregard the irrelevant and inappropriate information that may be included on the tape." (Vol. III, Tr. 845.) However, the tape was never admitted into evidence, and the record is not clear as to whether the trial court listened to the tape. Additionally, because appellant was able to cross-examine and permitted considerable latitude in questioning Detective Taylor regarding the alleged flawed, inconsistent, and inaccurate synopsis report, appellant's second assignment of error lacks merit and is not well-taken.
 {¶ 27} For the foregoing reasons, appellant's first, second, and third assignments or error are overruled and the decision of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
Petree and Brown, JJ., concur.
[1] On March 24, 2003, plaintiff-appellee ("the state"), nolle prossed the aggravated robbery count of the indictment. Further, the trial court granted appellant's Crim.R. 29 motion and dismissed the count of having a weapon while under disability.
[2] "Joe" was later identified as Joe Platt.