DECISION. *Page 2 
{¶ 1} Following a jury trial, defendant-appellant, Monique Robinson, was convicted of involuntary manslaughter under R.C. 2903.04(A) and endangering children under R.C. 2919.22(A). We affirm those convictions.
I. Facts
 {¶ 2} The record shows that on June 27, 2005, four-month-old Brinaya Faulkner died from a skull fracture. For most of that day, Robinson, a friend of the baby's mother, was babysitting her and her four-year-old sister, Egypt, at their home. Also present were Joenetta, Skye, and Joseph Bazel, ages eleven, ten, and nine respectively, who had come to play with Egypt.
 {¶ 3} Robinson left the children alone on a number of occasions while she went to the store down the street, smoked marijuana, and socialized with several men. During one of her absences, Egypt picked up Brinaya and sat her on the front-porch banister, which was approximately four to five feet tall. She let go of the baby, who fell off the banister and hit the back of her head on the bricks below.
 {¶ 4} According to the children, Robinson put ice on the baby's face, but she was not responsive. At approximately 5:00 p.m., she ran to the store up the street and told Mahdi Salloum, who was running the store, that the baby had been dropped. Salloum offered to call 911, but Robinson refused the offer, stating that a warrant for her arrest existed. Robinson used the telephone to call the baby's mother, Juanita Roberts, but could not reach her. Salloum told Robinson that she should call for an ambulance. Robinson told him that the baby was sleeping and left the store. *Page 3 
 {¶ 5} Robinson came back to the store some time later to use the telephone again. She attempted to call the baby's grandmother, Shawn Stevens. Instead, she reached Robert Covington, Stevens's boyfriend. She told Covington that the baby had fallen out of a stroller. Covington testified that the only stroller he had ever seen at Roberts's house was a small, toy stroller. Covington told Robinson to take the baby to the hospital. She said that she could not because of the warrant for her arrest. The two argued until Robinson hung up the phone.
 {¶ 6} Worried, Covington drove to Roberts's house, which took approximately eight to ten minutes. Robinson and the baby were still at the house when Covington arrived. Joenetta and Skye were also still present, and Robinson was putting ice on the baby's head and neck. Covington touched the back of the baby's head, and it felt soft. She was not moving, but he thought that she was still breathing. Despite Robinson's protestations about the warrant, Covington drove her and Brinaya to the hospital.
 {¶ 7} Laura Lakke was working as the triage nurse in the emergency room when Brinaya was brought in about 9:00 p.m. Robinson told her that the baby had fallen out of a stroller. Brinaya was limp and cool to the touch. Lakke held her close and could feel that she was not breathing and had no heartbeat. The back of her head was "mushy like a sponge," as Lakke would have expected with a skull fracture. Lakke testified that she believed that the baby was probably already dead.
 {¶ 8} Despite the trauma team's efforts, they could not revive Brinaya. The autopsy report stated that her cause of death was "[a]cute respiratory arrest due to blunt force trauma to the head," with contributory causes of a "skull fracture" and "cerebral edema." Dr. Michael Kenny, a pathologist with the Hamilton County *Page 4 
Coroner's Office, testified that she suffered a wrist fracture, as well as a skull fracture. He also testified that her injuries were not consistent with falling out of a stroller, but were consistent with falling from a porch banister. Though the death certificate indicated that the interval between the onset of the injury and death was "seconds to minutes," Kenny testified that if Brinaya had received immediate medical attention, "it is not necessary that the child would have ultimately died."
 {¶ 9} Officer Jennifer Luke interviewed Robinson after Brinaya's death. Robinson admitted to Officer Luke that she had left Roberts's home several times while babysitting to go to the market for snacks and cigarettes. But she claimed that Brinaya had fallen out of the stroller while she had gone inside to get a bottle. The only stroller the police found in the home was a toy stroller. Robinson stated that, after the fall, the baby had cried, but Robinson had rocked her and she had fallen asleep. After Brinaya had started "breathing funny," Robinson had called Covington. She claimed that she had not called 911 because the baby had been crying.
 {¶ 10} Once charges were brought against Robinson, she left town. Several months later, she was found in Wisconsin. Detective William Hilbert interviewed her there. She admitted that she had left the children several times to go to the store. She also admitted knowing that Egypt had previously picked up the baby and had dropped her. Robinson said that the last time she had been at the store, Joenetta had come running to tell her that Brinaya had fallen. Upon returning to the house, she had found the baby in the living room, and Joenetta had said that Egypt had dropped her. Robinson said that when Covington arrived, he had told her to tell the police that Brinaya had fallen out of the stroller. Covington adamantly denied telling Robinson to lie. *Page 5 
 II. Confrontation Clause
 {¶ 11} Robinson presents four assignments of error for review. In her first assignment of error, she contends that the trial court erred by permitting inadmissible hearsay evidence to be presented to the jury. She argues that its admission violated her right to confront the witnesses against her. While we find some merit in her argument, we ultimately conclude that this assignment of error is not well taken.
 {¶ 12} The Sixth Amendment to the United States Constitution states, "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him[.]" In Crawford v.Washington,[1] the United States Supreme Court held that the Confrontation Clause bars "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."[2]
 {¶ 13} The Court stated that the "use of ex parte examinations as evidence against the accused" is the principal evil the clause was meant to remedy.[3] It distinguished between testimonial and nontestimonial hearsay and held that only testimonial statements implicate the Confrontation Clause.[4] Testimony, the court stated, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact."[5] While it declined to "spell out a comprehensive definition" of "testimonial," it stated that the term "applies at a minimum" to prior testimony at a preliminary hearing, before a grand jury, or at a former trial, and to *Page 6 
police interrogations.[6] Police interrogations, the court stated, "fall squarely within" the class of statements the Confrontation Clause seeks to exclude.[7]
 {¶ 14} In this case, Officer Salvatore Tufano testified at length about statements Egypt had made to him during questioning. He stated that she had told him that she had put her sister on the banister and that the baby had fallen and hit the back of her head. The state contends that these statements were not testimonial because they were not admitted for their truth but to explain the officer's actions during the investigation.[8] We disagree. The officer testified in detail about what Egypt had told him. The record shows that Egypt's hearsay statements were offered for their truth and went to the heart of the state's case.
 {¶ 15} Further, the primary purpose of Tufano's interrogation of Egypt was to "establish or prove past events potentially relevant to later prosecution."[9] Thus, Egypt's statements were testimonial. They were part of an ex parte examination used as evidence against Robinson. Because Robinson had no opportunity to cross-examine Egypt, the admission of her hearsay statements into evidence violated Robinson's right to confront the witnesses against her.
 {¶ 16} Nevertheless, a constitutional violation can be harmless error if it did not, beyond a reasonable doubt, contribute to the conviction.[10] In this case, Egypt's statements were cumulative to the other evidence. Both Joenetta and Skye Bazel testified that, during one of Robinson's absences, Egypt had sat Brinaya on the banister and that Brinaya had fallen. Though they became confused on some details, *Page 7 
both were absolutely clear on those points. Further, Robinson herself acknowledged to Detective Hilbert that Joenetta had told her that Egypt had dropped the baby. Under the circumstances, we hold that the admission of Egypt's hearsay statements did not contribute to the conviction. Therefore, the error was harmless, and we overrule Robinson's first assignment of error.
III. Jury Instructions
 {¶ 17} In her second assignment of error, Robinson states that the trial court's jury instructions were erroneous and prejudicial. She argues that the evidence was insufficient to support an instruction on flight. She also argues that the jury instructions on proximate cause were "confusing, convoluted and legally inaccurate." This assignment of error is not well taken.
 {¶ 18} A trial court must fully and completely give the jury all instructions that are relevant and necessary for the jury to weigh the evidence and to discharge its duty as the factfinder.[11] An appellate court will not reverse a conviction due to improper jury instructions unless the defendant was prejudiced.[12] Further, a single instruction cannot be judged in isolation, but must be viewed in the context of the overall charge.[13] *Page 8 
 A. Flight
 {¶ 19} Evidence of flight is admissible to show consciousness of guilt.[14] Flight means some escape or affirmative attempt to avoid apprehension.[15] An instruction on flight is proper if the record contains sufficient evidence to support the charge.[16] The decision whether to instruct the jury on flight lies within the trial court's discretion. An appellate court will not reverse that decision absent an abuse of discretion.[17]
 {¶ 20} The record shows that Robinson adamantly refused to take Brinaya to the hospital because she believed that a warrant for her arrest on a probation violation existed, although the probation violation was not filed until some time later. She was also aware of the investigation into Brinaya's death. She originally told police that she had been at the house when the accident occurred and that Brinaya had fallen out of the stroller. She agreed to come in for further questioning, but instead she disappeared. Her boyfriend told Officer Luke that she was gone. The police searched for her for "a couple of months at least." Eventually, after receiving an anonymous tip, they found her in Wisconsin.
 {¶ 21} Thus, the state presented evidence from which the jury could reasonably have inferred that Robinson had fled to avoid prosecution. Robinson contends that she presented an innocent explanation for leaving town: that she had no place to live, and she went to stay with her sister. Courts have upheld the use of a *Page 9 
flight instruction even in situations where the alleged flight is consistent with innocence.[18] The issue was one of credibility, which was for the jury to decide.[19]
 {¶ 22} Further, the court specifically told the jury that evidence of flight "may be one of a series of circumstances from which guiltmay be inferred." (Emphasis added.) It went on to state, "As with other evidence[,] upon you alone rests the duty of weighing such evidence in light of all the evidence and to determine if the State has established the defendant's guilt beyond a reasonable doubt." Thus, the court's instruction did not raise a presumption of guilt or shift the burden of proof to Robinson to explain her flight.[20] Under the circumstances, we cannot hold that the trial court's decision to instruct the jury on flight was so arbitrary, unreasonable or unconscionable as to connote an abuse of discretion.[21]
 B. Proximate Cause
 {¶ 23} Next, Robinson contends that the trial court's instructions on proximate cause related to the involuntary-manslaughter charge were confusing and legally inaccurate. We agree that the instructions were somewhat confusing in places. Nevertheless, the instructions, when read as a whole, accurately conveyed to the jury the law on proximate cause.
 {¶ 24} An offender commits involuntary manslaughter when he or she causes "the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony."[22] The underlying felony in this case was child *Page 10 
endangering. R.C. 2919.22(A) provides that "[n]o person who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child by violating a duty of care, protection and support."
 {¶ 25} The term "proximate result" as used in the involuntary-manslaughter statute is equivalent to proximate cause.[23]
This court thoroughly discussed proximate cause in the context of the involuntary-manslaughter statute in State v. Lovelace.[24] The proximate-cause element is satisfied when the accused sets in motion a sequence of events that make the death of another a "direct, proximate, and reasonably inevitable consequence. "[25] Though the trial court's instructions were confusing in places, they did, for the most part, follow Lovelace.
 {¶ 26} Robinson takes issue with the court's instruction on intervening cause. In Lovelace, we stated that "an intervening act may be so disconnected and unforeseeable as to be a superseding intervening cause," and that, in such a case, the defendant "was not to be regarded as the cause of the injuries sustained."[26]
 {¶ 27} In this case, the trial court told the jury that "[t]he defendant is responsible for the natural consequences of the defendant's unlawful act or failure to act, even though death or serious physical harm to a person was also caused by the intervening act or failure to act of another person." This was a correct statement of law. Despite Robinson's claim to the contrary, the court also informed the jury later in the instructions that "an intervening act may be so disconnected and independent as to be a superseding cause, not reasonably foreseeable, that removes a defendant's *Page 11 
conduct as a cause of the injuries sustained." Thus, the court's instructions, when read a whole, accurately conveyed the law on intervening cause as stated in Lovelace.
 {¶ 28} Robinson next takes issue with the court's instruction on foreseeability, which stated that "[t]he test for foreseeability is not whether the defendant should have foreseen the injury in its precise form or * * * as to the specific person. The test is whether a reasonably prudent person in light of all the circumstances would have anticipated that death or serious physical harm was likely to result to anyone from performance of the unlawful act." We stated inLovelace that "the better instruction * * * is one that leaves aside the `reasonably prudent person' and charges the jury to consider instead whether the defendant, in light of everyday experience, should have reasonably foreseen the result as a natural consequence of his illegal conduct."[27]
 {¶ 29} Nevertheless, the court did go on to state in this case that "[t]he issue as to this particular element is whether in light of everyday experience and all the circumstances that the defendant should have reasonably foreseen the result, here alleged, to be the death of [Brinaya] Faulkner as a direct and natural and logical consequence of the defendant's conduct, here alleged, to be committing or attempting to commit child endangering." Again, the court's instructions as a whole adequately conveyed to the jury the law on foreseeability.
 {¶ 30} Under the circumstances, we cannot hold that the jury instructions, when viewed as a whole, prejudiced Robinson. We, therefore, overrule her second assignment of error. *Page 12 
 IV. Weight and Sufficiency
 {¶ 31} In her third assignment of error, Robinson contends that the evidence was insufficient to support her convictions. First, she contends that the state failed to prove the proximate-cause element. She argues that even if she did commit the offense of child endangering, she could not have reasonably foreseen that "a four year old would have picked up the infant, carried her outside, placed her on a banister, then let the child fall, causing a fatal injury."
 {¶ 32} It is certainly foreseeable that a four-year-old child might attempt to pick up her baby sister if left without adult supervision. Further, Robinson told police officers that she knew that Egypt had previously picked up the baby and dropped her and that she had told Egypt not to pick up the baby. Severe injury to the baby was within the scope of the risk created by leaving an unsupervised four-year-old with a baby. Robinson, in her ordinary experience, could have reasonably foreseen the result. The harm to the baby was not so "extraordinary or surprising that it would be simply unfair" to hold Robinson criminally responsible.[28]
 {¶ 33} Robinson further argues that the baby would have died regardless of whether she had immediately sought medical treatment. She cites Dr. Kenny's testimony that Brinaya died within "seconds to minutes" after the injury. But he also testified that she might not have died if given immediate medical attention. Questions of causation are generally matters for the jury to decide and "are seldom thought to be determinable as [a] matter of law."[29] Further, in this case, the baby would not have suffered the injury but for Robinson's absences, and, therefore, *Page 13 
Robinson's actions were the proximate cause of her death, regardless of when she died.
 {¶ 34} Robinson also contends that the evidence was insufficient to support her conviction for child endangering. She contends that she had asked Joenetta and Skye, ages ten and eleven, to watch the children, and that Joenetta had previously watched children. Therefore, she argues that she did not violate a duty of care or protection to Brinaya because she did not leave her unattended. We disagree. Robinson, an adult woman, was entrusted with the care of Egypt and Brinaya. Given the special circumstance that Robinson knew that Egypt had in the past picked up and dropped the baby, the jury could have reasonably inferred that she had violated a duty of care by leaving the children without adult supervision.[30]
 {¶ 35} Our review of the record shows that a rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could have found that the state had proved beyond a reasonable doubt all the elements of child endangering under R.C. 2919.22(A) and involuntary manslaughter under R.C. 2903.04(A). Therefore, the evidence was sufficient to support the convictions.[31]
 {¶ 36} Robinson also contends that her convictions were against the manifest weight of the evidence. After reviewing the record, we cannot say that the trier of fact lost its way and created such a manifest miscarriage of justice that we must reverse Robinson's convictions and order a new trial. Therefore, her *Page 14 
convictions were not against the manifest weight of the evidence.[32]
Consequently, we overrule Robinson's third assignment of error.
V. Allied Offenses of Similar Import
 {¶ 37} In her fourth assignment of error, Robinson contends that the trial court should not have sentenced her on both charges because they involved allied offenses of similar import. This court has held that involuntary manslaughter under R.C. 2903.04(A) and child endangering under R.C. 2919.22(A) are not allied offenses of similar import within the meaning of R.C. 2941.25.[33] We find no reason to revisit the issue. Despite Robinson's claim to the contrary, we must still followState v. Rance.[34] Accordingly, we overrule Robinson's fourth assignment of error and affirm her convictions.
Judgment affirmed. SUNDERMANN, P.J., and HENDON, J., concur.
[1] (2004), 541 U.S. 36, 124 S.Ct. 1354.
[2] Id. at 53-54; State v. Craig, 110 Ohio St.3d 306, 2006-Ohio-4571,853 N.E.2d 621, ¶ 81.
[3] Crawford, supra, at 50; State v. Lewis, 1st Dist. Nos. C-050989 and C-060010, 2007-Ohio-1485, ¶ 28.
[4] Crawford, supra, at 68; State v. Stahl, 111 Ohio St.3d 186,2006-Ohio-5482, 855 N.E.2d 834, ¶ 15-16; Lewis, supra, at ¶ 30.
[5] Crawford, supra, at 51; Stahl, supra, at ¶ 15.
[6] Crawford, supra, at 68; Lewis, supra, at ¶ 31.
[7] Crawford, supra, at 53; Stahl, supra, at ¶ 17.
[8] See Lewis, supra, at ¶ 41; State v. Jordan, 167 Ohio App.3d 157,2006-Ohio-2759, 854 N.E.2d 520, ¶ 47.
[9] Lewis, supra, at ¶ 31.
[10] State v. Keeling, 1st Dist. No. C-010610, 2002-Ohio-3299, ¶ 27;State v. Griffin (2001), 142 Ohio App.3d 65, 80, 753 N.E.2d 967.
[11] State v. Comen (1990), 50 Ohio St.3d 206, 553 N.E.2d 640, paragraph two of the syllabus; State v. Haynes, 1st Dist. No. C-020685,2004-Ohio-762, ¶ 10.
[12] State v. Cotton (Aug. 14, 1996), 1st Dist. No. C-950208;State v. Shue (1994), 97 Ohio App.3d 459, 471, 646 N.E.2d 1156.
[13] State v. Price (1979), 60 Ohio St.2d 136, 398 N.E.2d 772, paragraph four of the syllabus; Cotton, supra.
[14] State v. Eaton (1969), 19 Ohio St.2d 145, 249 N.E.2d 897, paragraph six of the syllabus, vacated as to death penalty (1972),408 U.S. 935, 92 S.Ct. 2857; State v. Brundage, 1st Dist. No. C-030632,2004-Ohio-6436, ¶ 17.
[15] Brundage, supra, at ¶ 17.
[16] Id.
[17] Id. at ¶ 18.
[18] State v. Goodbread, 12th Dist. No. Ca2003-02-038, 2004-Ohio-419, ¶ 10.
[19] See State v. Bryan, 101 Ohio St.3d 272, 2004-Ohio-971,804 N.E.2d 433, ¶ 116; State v. Anderson, 7th Dist. No. 03 MA 252, 2006-Ohio-4618, ¶ 113.
[20] See Brundage, supra, at ¶ 21; State v. McKibbon, 1st Dist. No. C-010145, 2002-Ohio-2041; State v. Draper, 10th Dist. No. 02AP-1371, 2003-Ohio-3751, ¶ 33.
[21] See State v. Clark, 71 Ohio St.3d 466, 470, 1994-Ohio-43,644 N.E.2d 331; Brundage, supra, at ¶ 20.
[22] R.C. 2903.04(A).
[23] State v. Swank, 10th Dist. No. 03AP-440, 2004-Ohio-3832, ¶ 16;State v. Losey (1985), 23 Ohio App.3d 93, 95, 491 N.E.2d 379.
[24] (1999), 137 Ohio App.3d 206, 738 N.E.2d 418.
[25] Id. at 215, quoting State v. Chambers (1977), 53 Ohio App.2d 266,272, 373 N.E.2d 393.
[26] Id. at 222.
[27] Id. at 222-223.
[28] Id. at 216.
[29] Id. at 217.
[30] See State v. Caton (2000), 137 Ohio App.3d 742, 749-750,739 N.E.2d 1176.
[31] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus; Swank, supra, at ¶ 13-20; State v.Cooper, 147 Ohio App.3d 116, 121-124, 2002-Ohio-617, 768 N.E.2d 1223, limited on other grounds in State v. Dunaway, 12th Dist. No. CA2001-12-280, 2003-Ohio-1062; State v. Parson (Dec. 22, 2000), 1st Dist. No. C-990404.
[32] See State v. Thompkins, 78 Ohio St.3d 380, 386-388, 1997-Ohio-52,678 N.E.2d 541; Cooper, supra, at 124-125.
[33] State v. Klein (Dec. 3, 1999), 1st Dist. No. C-990066. AccordState v. Lowe, 164 Ohio App.3d 726, 2005-Ohio-6614, 843 N.E.2d 1243, ¶ 22.
[34] 85 Ohio St.3d 632, 1999-Ohio-291, 710 N.E.2d 699. *Page 1