[Cite as *State v. Arnold*, 2023-Ohio-1639.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-220253 |
| | | TRIAL NO. B-1905432-B |
| Plaintiff-Appellee, | : | |
| | : | |
| vs. | : | |
| | : | *O P I N I O N.* |
| MATTHEAU ARNOLD, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 17, 2023

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*John D. Hill, Jr.*, for Defendant-Appellant.

**BERGERON, Presiding Judge.**

{¶1}   A friendship between a group of men soured before turning deadly, leading to the murder of Ricky Jackson.  Shortly thereafter, defendant-appellant Mattheau Arnold was arrested and indicted for the murder and felonious assault of Mr. Jackson.  After a trial, the jury convicted Mr. Arnold of murder and the predicate felonious assault count but exonerated him of several firearm-related counts—the trial court later merged the counts for the purpose of sentencing.  Mr. Arnold now appeals, challenging his conviction as against the manifest weight of the evidence, unsupported by sufficient evidence, internally inconsistent, and improperly infected by prosecutorial misconduct.  After reviewing these arguments and the record, however, we are not persuaded, and we therefore overrule his assignments of error and affirm the trial court's judgment.

I.

{¶2}   The story of Mr. Jackson's death implicates a web of many individuals, including his best friend Isaiah Palmer.  The duo were also friends with Mickey Arnold,[1] the brother of Mr. Arnold.  In early to mid-July 2019, the three friends attended a party.  At some point, Mr. Palmer left the party temporarily before returning with Tamara Jackson, his girlfriend and Mr. Jackson's sister.

{¶3}   When the two returned in Ms. Jackson's car, Mr. Palmer and Mickey began arguing over a seemingly trivial matter: Mickey nursed a grievance that Mr. Palmer had abandoned him at the party with Mr. Jackson.  As Mr. Palmer stepped out of the car upon his return, Mickey—apparently intoxicated—greeted him by picking

---

[1] Mickey's legal first name also happens to be Mattheau, but for clarity, he will be referred to throughout by his nickname, "Mickey."  Defendant-appellant Mattheau Arnold will be referred to throughout as "Mr. Arnold."

him up and slamming him to the ground. Mr. Palmer dusted himself off and then returned the favor by slamming Mickey. Ms. Jackson dashed inside the house, urging her brother to come out and break up the melee.

{¶4} When the brother and sister came out, they discovered Mr. Palmer on top of Mickey, punching him. Mr. Jackson then joined the fray by jumping on Mr. Palmer's back and punching Mickey. According to Ms. Jackson, a large unnamed individual intervened to break up the fight and scooped up Mickey. Mr. Jackson— taking advantage of the opportunity—took a final swing at Mickey, which landed and knocked him unconscious.

{¶5} After punching Mickey, the trio of Mr. Jackson, Ms. Jackson, and Mr. Palmer left the party in her car. By this point, Mickey came to, and unleashed a barrage of threatening phone calls to Mr. Jackson, exhorting him to return in order to resume the fight. To avoid Mickey as best as they could, the three filtered out into various houses where they could hide out and wait for tempers to cool down. They eventually reconvened at a friend's house to retrieve Mr. Jackson's .45 caliber gun, apparently to protect themselves in case matters turned violent. While continuing to receive calls from Mickey—as he drove around searching for them—the three went to Mr. Jackson's mother's house to spend the night.

{¶6} The next morning, after taking Mr. Palmer to work, Ms. Jackson drove herself and Mr. Jackson to her apartment—the siblings lived together at the time. A couple of hours later, Mickey knocked on the door of the apartment, demanding that the two come outside. Mr. Jackson answered the door, with his gun in hand. After Mickey—who was holding a revolver in his own hand—demanded that he come outside to fight, Mr. Jackson ordered him to leave. To scare Mickey away, Mr. Jackson told

him that somebody standing across the street had a gun trained on him—as Mickey glanced in that direction, Mr. Jackson quickly scrambled back into the apartment and slammed the door.

{¶7} While Mickey continued to hound Mr. Jackson, insisting on a fight, Ms. Jackson nudged him to do so in order to hopefully settle the matter. Eventually, it was arranged for Mr. Jackson and Mickey to meet at a location where Ms. Jackson and Mr. Palmer's brother, Ty Holloway, would hold their respective guns, to keep the fight from turning deadly. Although Mr. Holloway and Ms. Jackson showed up at the meeting place, the two supposed combatants turned up missing. Ms. Jackson would later testify that when she returned home, she saw her brother pull out from her apartment complex hiding in the backseat of someone else's car—apparently reluctant to engage in further fisticuffs.

{¶8} Later that afternoon, Mr. Palmer returned home from work and arranged his own fight with Mickey—a fight that actually transpired. Mr. Palmer later told a police officer in a recorded interview that Mr. Arnold accompanied his brother at this fight, but at trial, Mr. Palmer testified that he could not recall seeing Mr. Arnold there (this would not be the first time that he would offer conflicting testimony between his recorded interview versus at trial). Regardless, defense counsel concedes that Mr. Arnold was indeed present at the fight between Mr. Palmer and Mickey. Although all seemed to be squared away after that duel, Mickey remained dissatisfied, and sought out Mr. Jackson again—about a month later in August 2019.

{¶9} On August 1, Mr. Palmer and Mr. Jackson left his sister's apartment in her car and went to Lisa Webb's (Mr. Holloway's mother) house—where Mr. Palmer resided at the time. Around 10:30 that night, Mr. Palmer approached Ms. Webb to

report that Mickey, Mr. Arnold, and a third unnamed man were all standing in her yard—again, at trial, he failed to recall if Mr. Arnold was among the individuals. However, Ms. Webb and her granddaughter, Shionna, both testified that Mr. Arnold was indeed present at her house. When Ms. Webb went out to see the commotion, Mickey demanded that she send out Mr. Jackson so that they could have a fistfight. When she refused, he threatened that, if Mr. Jackson did not come outside to fight, "he was going to kill him."

{¶10} Mickey further insisted that he would have Ms. Webb hold his revolver to ensure a fair fight: an offer she also refused. In recalling the event later, Shionna initially told the police that Mr. Arnold had an object in his hand with his shirt wrapped around it that she had thought could be a gun, but she did not know for sure. Ms. Webb recalled that Mr. Arnold was shirtless with a shirt wrapped around his hand and had made a remark about having driven two hours to be a witness to the events at hand—but she did not think that he had a gun. In his recorded interview, Mr. Palmer apparently saw all three men, Mr. Arnold included, with a gun in their respective hands, but he could not recall at trial what he saw. Upon Ms. Webb's further insistence that the three men leave her house, they eventually departed.

{¶11} About half an hour after this encounter, Mr. Jackson and Mr. Palmer left to return to Ms. Jackson's apartment. On their way over, Mr. Jackson called his sister ahead of time to alert her. Approximately two minutes after receiving this call, Ms. Jackson recalls hearing multiple gun shots outside: "like big gunshots and little gunshots." She quickly hid in her bathroom for safety and called 911. At trial, Mr. Palmer explained that after he and Mr. Jackson pulled into the parking lot, "[t]hree

people ran out with guns." Mr. Palmer said that the three started shooting at him and Mr. Jackson, so he shot back with Mr. Jackson's gun in self-defense.

{¶12} While Mr. Palmer identifies Mickey as one of the three shooters that night, he could not recall if Mr. Arnold participated. Again, this conflicts with the statement he made to the police where he identified Mr. Arnold as one of the three participants. After the shots rang out, Mr. Palmer found his friend on the ground bleeding with a single shot to the abdomen.

{¶13} After the shooting, Mr. Palmer rushed and knocked on the window outside of Ms. Jackson's apartment. With previous felonies on his record, he asked her to take the gun and hide it in her apartment. When the police converged on the scene, they attempted to render aid to Mr. Jackson to no avail. At the scene, the police found four cars parked to the right of the building: a blue Toyota, a black Cadillac, a black Saturn (Ms. Jackson's car that Mr. Jackson and Mr. Palmer had parked), and a yellow Dodge truck. Around the black Cadillac, the officers found six .45 casings, and one live .45 round. After being interviewed by the police, Ms. Jackson and Mr. Palmer initially failed to disclose Mr. Palmer's presence at the shooting in an effort to shield him given his prior record. The interviews with Mr. Palmer, Ms. Jackson, and other eyewitnesses also suggested the presence of a weapon in her apartment. With her consent, the detectives retrieved the gun, and a ballistics expert confirmed that the .45 caliber gun found in her apartment—Mr. Jackson's gun—was the gun that shot the bullets holding the six .45 cartridge cases found at the scene.

{¶14} The officers also found two .380 bullet casings in the bed of the Dodge truck. The ballistics expert confirmed these two .380 casings could not have been fired from Mr. Jackson's gun. Additionally, the expert explained that a revolver's cartridge

6

casings must be ejected manually, as opposed to automatically in the case of the .45. However, the expert could not determine whether the .380 rounds came from a revolver, such as the one that Mickey was alleged to have, or a different gun.

{¶15} Later, at the police precinct, both Ms. Jackson and Mr. Palmer provided official statements. She informed the police that she believed that Mickey was the shooter and responsible for her brother's death based on her perception of the events that had transpired prior to the shooting. During Mr. Palmer's recorded interview, which occurred four days after the shooting, he identified Mickey and Mr. Arnold as the shooters who fired at him and Mr. Jackson as they tried to escape. After local police signed arrest warrants for both Mickey and Mr. Arnold, Mickey was arrested in California and Mr. Arnold later surrendered to authorities in California. The two were initially scheduled for a joint trial in the death of Mr. Jackson in August 2021.

{¶16} In July 2021, however, deputies at the detention center where Mr. Arnold and Mickey were detained intercepted two letters sent between the brothers. In his first letter, Mr. Arnold shared his understanding that Mickey and his attorneys sought to fabricate a story about the events leading up to Mr. Jackson's death—Mr. Arnold believed this scheme unwise as it would likely lead to both of their convictions. Instead, he proposed to his brother a different timeline of the events that would place him away from the scene at the time of the shooting.

{¶17} In his second letter, Mr. Arnold again expressed discomfort with Mickey's plan given his belief that all of the essential evidence produced in discovery implicated Mickey in the murder—thus, nothing would be gained by implicating Mr. Arnold. Although he implored Mickey to "do the right thing," he also suggested that the two consider letting the chips fall where they may for Mickey's defense *or* allow

7

Mr. Arnold to take the fall for his brother. Ultimately, the discovery of the letters prompted separate trials for the brothers.

{¶18} At Mr. Arnold's trial, the prosecution provided testimony of detectives who reported and investigated the accident, the ballistics expert, Ms. Jackson, Ms. Webb, Shionna, and Mr. Palmer. A detective qualified in cell phone mapping technology testified that, after reviewing the cell phone records of Mickey's phone on the night of Mr. Jackson's death, Mickey had received a phone call around the same time that Ms. Jackson called 911 and within close proximity of the murder, which effectively placed Mickey near the scene.

{¶19} While most of the testimony offered at trial largely tracked the summary above, the details of Mr. Palmer's recorded police interview—where he implicated Mr. Arnold—seemed to escape his memory at trial. Although the prosecution asked him if he received any threats for testifying—the transcript of his police interview somehow ended up on Facebook—or whether he was concerned about being called a "snitch," he disavowed any such concerns while maintaining no recollection of Mr. Arnold's presence at the scene. Eventually, the court granted the prosecution's request to play a recording of Mr. Palmer's police interview to the jury, pursuant to Evid.R. 803(5).

{¶20} The jury ultimately convicted Mr. Arnold of felonious assault by causing or attempting to cause harm to Mr. Jackson by means of a deadly weapon. However, the jury did not find him guilty of the two specifications: that he (1) had a firearm while committing the felonious assault, or (2) displayed, brandished, or indicated that he possessed or used the firearm to facilitate the felonious assault. The jury also convicted Mr. Arnold for felony murder for causing the death of Mr. Jackson as a proximate result of committing felonious assault (while acquitting him of the same

8

two firearm specifications for this count). Finally, the jury acquitted Mr. Arnold of purposely causing the death of Mr. Jackson. The court merged the felony murder and felonious assault counts and sentenced him to an indefinite prison term of 15 years to life. Mr. Arnold now appeals, presenting four assignments of error.

II.

**{¶21}** Mr. Arnold's first and second assignments of error (challenging the manifest weight and the sufficiency of the evidence) intertwine, so we will consider them together for ease of analysis.

**{¶22}** When faced with a manifest weight of the evidence challenge, we must consider whether the state "carried its burden of persuasion" before the trial court. *State v. Messenger*, Slip Opinion No. 2022-Ohio-4562, ¶ 26; *see State v. Martin*, Slip Opinion No. 2022-Ohio-4175, ¶ 26. Unlike the burden of production, which concerns a party's duty to introduce *enough* evidence on an issue, the burden of persuasion represents a party's duty to convince the factfinder to view the facts in his or her favor. *Messenger* at ¶ 17. Therefore, in order for us to conclude that the factfinder's adjudication of conflicting evidence ran counter to the manifest weight of the evidence—which we reserve for only the most exceptional circumstances—we must find that the factfinder disregarded or overlooked compelling evidence that weighed against conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 388, 678 N.E.2d 541 (1997). We accordingly sit as a "thirteenth juror" in this respect. *Id.*

**{¶23}** To determine the sufficiency of the evidence to support a criminal conviction, we consider whether, after viewing the evidence in the light most favorable to the state, any reasonable trier of fact could have found all the essential elements of the offense proven beyond a reasonable doubt. *State v. MacDonald*, 1st Dist.

Hamilton No. C-180310, 2019-Ohio-3595, ¶ 12, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). We review sufficiency determinations de novo, *State v. Dent*, 163 Ohio St.3d 390, 2020-Ohio-6670, 170 N.E.3d 816, ¶ 15, and we must not weigh the evidence. *MacDonald* at ¶ 12. When the evidence is subject to more than one possible interpretation, we must adopt the interpretation consistent with the trial court's judgment. *In re J.C.*, 1st Dist. Hamilton No. C-180493, 2019-Ohio-4027, ¶ 20.

**{¶24}** Mr. Arnold claims that the prosecution failed to present any evidence that he ever had a gun in his hand at the scene where Mr. Jackson died. At most, he portrays himself as an unwitting bystander rather than an actual participant in the murder. At trial, the prosecution primarily relied on Mr. Palmer's testimony—the only individual who witnessed the shooting—but his lack of memory on the stand led to him testifying that he did not see, or did not remember seeing, Mr. Arnold with a gun in his hand (much less shooting at him and Mr. Jackson). Without any inculpatory evidence, Mr. Arnold insists that the jury had no basis upon which to convict him of causing physical harm by means of a deadly weapon.

**{¶25}** The state responds, however, that Mr. Arnold was convicted of felony murder under a theory of complicity: "To prove complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the prosecution must show 'the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.' " *State v. Maynard*, 10th Dist. Franklin No. 11AP-697, 2012-Ohio-2946, ¶ 32, quoting *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus. And while aiding and abetting can be established by overt acts of assistance, "the mere

presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor." *Id.*, quoting *State v. McWhorter*, 10th Dist. Franklin No. 08AP-263, 2003-Ohio-6225, ¶ 18.

**{¶26}** Mr. Arnold's conviction is premised upon causing or attempting to cause physical harm to another "by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2). However, the jury also found that he did not have a firearm while committing the aforementioned offense. This almost certainly means that the jury convicted him under an accomplice theory: that he *aided and abetted* Mickey, who caused harm to Mr. Jackson by means of a deadly weapon.

**{¶27}** For the most part, the state presented circumstantial evidence that tied Mr. Arnold to the murder, including his presence at the fight between Mr. Palmer and Mickey a month prior, his presence at Ms. Webb's house possibly with a weapon—where Mickey threatened to kill Mr. Jackson—testimony that Mr. Arnold left with Mickey after the confrontation at Ms. Webb's house, Mickey's phone located within the proximity of the murder, and Mr. Palmer confirming at trial that Mickey shot at him and Mr. Jackson alongside two other individuals. All of this indicates that Mr. Arnold was not simply an innocent bystander. However, the main piece of evidence implicating him in the murder is Mr. Palmer's recorded statement to the police.

**{¶28}** The transcript of that interview reveals the following concerning the shooting:

Detective: Did [the assailants] come out of a car? Did they –

Mr. Palmer: They was in the woods. They was already hiding. They was already there.

Detective: Okay.

Mr. Palmer: Was already there.

Detective: And there were how many of them?

Mr. Palmer: Three

Detective: Three. And Rick – Mickey was one of them.

Mr. Palmer: Um-hmm.

Detective: Right. Do you know the other two?

Mr. Palmer: [Mr. Arnold][2].

Detective: Okay.

Mr. Palmer: And I don't know the other guy.

Detective: Okay. That's good. So you were familiar with, obviously,

Mickey, because you fought him.

Mr. Palmer: Yeah.

Detective: You're familiar with [Mr. Arnold]. Is he related in some

way?

Mr. Palmer: Yes. That's his brother.

* * *

Detective: There's no doubt in your mind that this was Mickey –

Mr. Palmer: Yeah.

Detective: -- [Mr. Arnold] –

Mr. Palmer: For sure.

Detective – and this other fellow.

Mr. Palmer: For sure, for sure.

---

[2] During the interview, the witness refers to Mr. Arnold by his alias.

Detective: You're positive about that.

Mr. Palmer: I'm positive.

Detective: All right.

Mr. Palmer: Absolutely positive. No doubt about it.

{¶29} During trial, the state sought admission of this prior statement under Evid.R. 803(5). *See State v. Pitts*, 9th Dist. Medina No. 17CA0060-M, 2018-Ohio-3216, ¶ 23, quoting Evid.R. 803(5), and *State v. Rutkowski*, 9th Dist. Lorain No. 94CA005831, 1996 Ohio App. LEXIS 2273, *12 (May 31, 1995) ("Evid.R. 803(5) permits recorded recollections to be read into evidence under certain circumstances. For the statement to come in as substantive evidence, the testimony of the witness must establish that: '(1) the witness does not have a present recollection of the events in question; (2) the recorded recollection was made at a time when the events were fresh in the witness's memory; (3) the recorded recollection was made or adopted by the witness; and (4) the recorded recollection correctly reflects the prior knowledge of the witness.' * * * The rule prohibits the admission of the recorded statement as an exhibit 'unless offered by an adverse party.' "). The defense does not challenge the admissibility of the prior statement on appeal, so we must conclude that the jury properly considered it.

{¶30} It appears that the jury chose to consider Mr. Palmer's prior interview, taken just a few days after the incident, and believe that account rather than his amnesia on the stand. And the jury was well within its rights to credit the recorded police interview to support the conviction. *See State v. Abduleh*, 10th Dist. Franklin No. 20AP-473, 2021-Ohio-4495, ¶ 27, 29 (where declarant could not remember what happened during an argument with the defendant, "the trial court could reasonably

conclude that the recorded police interview reflected [Declarant]'s prior knowledge of the incident correctly. * * * [Declarant]'s statements in the recorded interview * * * provided the trial court with clear and convincing evidence that [defendant] had committed the offenses charged in the indictment."). And "eyewitness identification testimony alone is sufficient to support a conviction—even where discrepancies exist— so long as a reasonable juror could find the eyewitness testimony to be credible." *State v. Rudd*, 8th Dist. Cuyahoga No. 102754, 2016-Ohio-106, ¶ 37. According to this statement, Mr. Arnold actively assisted in the shooting in a manner sufficient to establish complicity.

**{¶31}** The circumstantial evidence surveyed above, combined with Mr. Palmer's unequivocal pretrial statement, confirms that the jury had sufficient evidence upon which it could convict Mr. Arnold on a complicity theory. *See MacDonald*, 1st Dist. Hamilton No. C-180310, 2019-Ohio-3595, at ¶ 12, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Nor can we say that the conviction is against the manifest weight of the evidence in light of the record at hand. To be sure, this was not an airtight case, but the evidentiary foundation marshalled by the state convinces us that no manifest injustice occurred by virtue of the jury's verdict. Therefore, we overrule Mr. Arnold's first and second assignments of error.

## III.

**{¶32}** Mr. Arnold's third assignment of error challenges alleged inconsistency in the jury verdicts. In this respect, he emphasizes that the acquittals for the firearm specifications cannot be reconciled with the guilty finding of felony murder, which legally required him to have caused physical harm by means of a deadly weapon.

**{¶33}** But again, the jury was instructed on accomplice liability, and could have convicted him as an accomplice to Mickey's crime. While mere presence at the scene may have been insufficient to prove accomplice liability, *see Maynard*, 10th Dist. Franklin No. 11AP-697, 2012-Ohio-2946, at ¶ 32, quoting *Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796, at syllabus, an accomplice can be found guilty of felonious assault pursuant to R.C. 2903.11(A)(2), even without being convicted of a gun specification, if the principal was responsible for using or discharging a weapon, and the accomplice aided and abetted the principal in their crime. *See State v. Foster*, 8th Dist. Cuyahoga Nos. 56336 and 56393, 1989 Ohio App. LEXIS 4973, *9 (Nov. 30, 1989) ("[E]ven accepting [defendant accomplice's] characterization of his role in the crime as a 'physically unarmed driver,' [defendant accomplice] is criminally culpable to the same degree as [principal] who actually fired the gun at [victim]. * * * In this sense, [defendant accomplice's] conviction under 2903.11(A)(2) is identical in degree and quality to [principal's] conviction under the same section."); *State v. Murray*, 11th Dist. Lake No. 2003-L-045, 2005-Ohio-1693, ¶ 36 ("[Principal] admitted to hitting victim with a flashlight. Thus, if the jury determined that [defendant accomplice] assisted, supported, encouraged, or cooperated with [principal], it could find [defendant accomplice] guilty of a violation of R.C. 2903.11(A)(2)."); *State v. Bradley*, 8th Dist. Cuyahoga No. 108983, 2020-Ohio-3460, ¶ 41 ("The testimonial and circumstantial evidence in the case at hand, along with the law regarding complicity, supports a jury finding that [defendant] either shot at the [victims], or aided and abetted the shooters * * * .").

**{¶34}** Across both his trial testimony and his recorded interview, Mr. Palmer remained consistent that Mickey shot at him and Mr. Jackson outside of the

15

apartment.  Therefore, even if we accept the jury's conclusion that Mr. Arnold did *not* have a gun, as long as he aided and abetted Mickey—which, based on the circumstantial evidence presented at trial, the jury could so find—he can certainly be convicted of felony murder without conviction for the underlying gun specification. Therefore, his convictions were not internally inconsistent.

{¶35}  Mr. Arnold features *State v. Koss*, 49 Ohio St.3d 213, 219, 551 N.E.2d 970 (1990), in an effort to persuade us otherwise.  In *Koss*, the Supreme Court found the jury's verdict inherently inconsistent, after it found the defendant guilty of voluntarily manslaughter, but not guilty of the gun specification where the victim died of a gunshot wound.  But *Koss* is factually distinct from this case because it did not deal with a second perpetrator, so the Supreme Court had no occasion to consider accomplice liability.  Because the jury could have found Mr. Arnold guilty as an accomplice to Mickey, it was not inconsistent to find him guilty of felony murder, but not guilty of the accompanying gun specification.  We accordingly overrule his third assignment of error.

IV.

{¶36}  Finally, Mr. Arnold argues that the prosecution committed misconduct in two ways: by repeating insinuations of witness intimidation, and by insisting that the jury convict him, on trial before Mickey, so that he could not later assume all responsibility at Mickey's trial to secure an acquittal for his brother.

{¶37}  "The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." *State v. Nields*, 93 Ohio St.3d 6, 37, 752 N.E.2d 859 (2001), citing *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984).  "To determine whether a

prosecutor's remarks at trial constituted misconduct, we must determine (1) whether the remarks were improper, and (2) if so, whether the remarks prejudicially affected the accused's substantial rights. * * * It must be clear beyond reasonable doubt that, absent the prosecutor's comments, the jury would have found the defendant guilty." *State v. Grimes*, 1st Dist. Hamilton No. C-030922, 2005-Ohio-203, ¶ 18, citing *Smith* at 14, and *State v. Treesh*, 90 Ohio St.3d 460, 464, 739 N.E.2d 749 (2001).

{¶38} Mr. Arnold first emphasizes that the prosecution insinuated that certain witnesses had been intimidated and were thus hesitant to appear to testify against him, particularly with respect to Mr. Palmer and his memory loss at trial. Because Mr. Palmer had identified Mr. Arnold in his recorded interview, but seemed to no longer remember critical details, it was probative to explore why his story changed. *See Grimes* at ¶ 56 ("But the references to witness intimidation were not improper because they were offered to demonstrate why the witnesses' stories had changed, and why some of the witnesses had not immediately come forward to the police with information about the shooting."). Especially since Mr. Palmer's interview surfaced on Facebook, the prosecution sought to understand his reluctance to corroborate his prior statement to the police.

{¶39} Regardless, each time that the defense objected to questions that seemed to imply witness tampering or intimidation, the trial court sustained the objections. We see nowhere in the portions of the record identified by the defense where anyone actually accused Mr. Arnold of any witness intimidation. Given the limited nature of the questions asked, their connection with the change of story by a witness, and the trial court's sustaining of objections where potentially improper insinuations emerged, we fail to see any prosecutorial misconduct here.

17

**{¶40}** Second, Mr. Arnold takes issue with the following commentary during closing statements from the prosecution:

[A]nd again, with the theory of double jeopardy, if [Mr. Arnold] is found not guilty you cannot try him twice for the same crime. So there's nothing to prevent him at Mickey's trial for [] saying that he did it. And you can be sure that Mickey's attorneys are not going to admit what [Mr. Arnold's attorneys] said today that Mickey did this. They're never going to admit that. They're going to deny that he did it and use completely different arguments, which they're entitled to, because their job is to represent Mickey.

**{¶41}** Insisting that the prosecutor sought to "inflame the passions and prejudice of the jury," Mr. Arnold also frames the comment as an invitation for the jury to decide the case on matters beyond the evidentiary record. And, admittedly, we do have concerns about the nature of this statement. However, trial counsel failed to object to this remark, which limits our review to plain error. *See State v. Ushry*, 1st Dist. Hamilton No. C-050740, 2006-Ohio-6287, ¶ 47 ("Because [defendant] did not object to the last two remarks, we must review the alleged misconduct for plain error. Thus, we must be convinced that [defendant] would not have been convicted but for the alleged misconduct in order to reverse his conviction.").

**{¶42}** On a plain error review, we cannot say that the nature of the remarks was so prejudicial as to justify a new trial. *See State v. Canterbury*, 4th Dist. Athens No. 13CA34, 2015-Ohio-1926, ¶ 20 ("[I]n light of the other evidence before the jury, it is not clear that Appellant would not have been convicted in the absence of the improper comments."). Mickey, of course, sat at the epicenter of this trial, and some

18

aspects of the comment do interrelate to the evidentiary record. The aspects beyond it, while troubling, are not so egregious as to warrant a new trial given the evidentiary record described above. We accordingly overrule Mr. Arnold's fourth assignment of error.

\* \* \*

**{¶43}** In light of the foregoing analysis, we overrule Mr. Arnold's four assignments of error and affirm the judgment of the trial court.

Judgment affirmed.

**WINKLER,** and **KINSLEY, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.